The solution of the important substantive questions presented in this case has been complicated by the unexplained and unsatisfactory state of the record. Throughout these proceedings the only one of the twelve individuals named as defendants who *Page 577 
has apparently taken any action has been the defendant Clement O. Miniger. He alone filed a demurrer to the original and amended petitions in the Court of Common Pleas, and he alone appealed from the decision of the Court of Appeals to this court. The parties and the courts below, however, seem to have treated the case as though the rights of all the defendants were before the court for adjudication. Though nowhere in the record expressly so stated, the trial court with the evident acquiescence of the plaintiff treated the demurrer filed by one defendant as inuring to all defendants, and, after sustaining the demurrer in an oral opinion, ordered that the demurrer to the amended petition be sustained, and expressly stated in the journal entry that the amended petition "is dismissed as to alldefendants at plaintiff's costs, and judgment is hereby rendered accordingly." (Italics ours.) Upon appeal, the Court of Appeals vacated this order and remanded the cause "to the Court of Common Pleas of Lucas county, Ohio, for further proceedings according to law * * *."
Notice of appeal to this court was given by defendant Miniger alone. The motion to certify and the assignments of error filed in this court were both on behalf of Miniger alone. We are accordingly of the opinion that only the rights and liabilities of the defendant Miniger are before us for adjudication.
With respect to the substantive questions of law presented on this appeal, defendant Miniger has filed in this court two specific assignments of error:
"1. The characterization of Herbert S. Bigelow as a 'paid lobbyist for the Single Tax Movement' did not present a question of fact for the jury to determine as to whether such language is libelous.
"2. The alleged defamatory language was absolutely privileged, the language being material and relevant to the argument opposing the Bigelow amendments." *Page 578 
In reaching a conclusion adverse to the defendant on these two points, the Court of Appeals dealt with them in the reverse order, and we shall do likewise.
On the question of absolute privilege the Court of Appeals in its opinion stated: "Privilege is accorded such publication because it is in the interest of the public, that there be freedom of discussion of the proposed legislation." The court, however, went on to deny the defendant Miniger's claim of absolute privilege on the ground that the statement made was not relevant. The defendant in this court contends that the statement was relevant "and hence absolutely privileged, the argument containing the alleged defamatory statements having been prepared by persons appointed by the Governor pursuant to Section 1g of Article II of the Ohio Constitution and G. C. 4785-180a and having been circulated by the Secretary of State pursuant to G. C. 4785-180b." In order to determine the correctness of this contention, and to ascertain the extent of the protection such a privilege would afford, it is necessary to examine the underlying reasons for granting or withholding privilege in circumstances such as we have in the case at bar.
The only publication of the statement alleged in the plaintiff's amended petition was the distribution "by the Secretary of State to the various electors of the state of Ohio in accordance with law." This distribution "in accordance with law" is that provided for in Section 1g, Article II of the Ohio Constitution:
"A true copy of all laws or proposed laws or proposed amendments to the Constitution, together with an argument or explanation, or both, for, and also an argument or explanation, or both, against the same, shall be prepared. * * * The person or persons who prepare the argument or explanation, or both, for the law, section or item, submitted to the electors by referendum petition, or against any proposed law submitted by supplementary petition, shall be named by the General *Page 579 
Assembly, if in session, and if not in session then by the Governor. The Secretary of State shall cause to be printed the law, or proposed law, or proposed amendment to the Constitution, together with the arguments and explanations, not exceeding a total of three hundred words for each, and also the arguments and explanations, not exceeding a total of three hundred words against each, and shall mail, or otherwise distribute, a copy of such law, or proposed law, or proposed amendment to the Constitution, together with such arguments and explanations for and against the same to each of the electors of the state, as far as may be reasonably possible."
These constitutional provisions are implemented by Sections 4785-180a and 4785-180b, General Code.
Upon certain privileged occasions where there is a great enough public interest in encouraging uninhibited freedom of expression to require the sacrifice of the right of the individual to protect his reputation by civil suit, the law recognizes that false, defamatory matter may be published without civil liability. 1 Cooley on Torts (4 Ed.), 522, Section 151.
Such privileged occasions have by long judicial history been divided into two classes — occasions absolutely privileged and those upon which the privilege is only a qualified one. The distinction between these two classes is that the absolute privilege protects the publisher of a false, defamatory statement even though it is made with actual malice, in bad faith and with knowledge of its falsity; whereas the presence of such circumstances will defeat the assertion of a qualified privilege. Inasmuch as the present amended petition, the sufficiency of which is being tested upon demurrer, contains allegations of express and actual malice, bad faith and known falsity, it is obvious that a qualified privilege here would be insufficient. We must, therefore, consider whether there exists, in the situation *Page 580 
set forth by the allegations of the plaintiff's petition, an occasion of absolute privilege.
It has been said by many courts that the occasions of absolute privilege are few and that the tendency is to limit them rather strictly to the following types of occasions: (1) The legislative proceedings of sovereign states; (2) judicial proceedings in established courts of justice; (3) official acts of the chief executive officers of state or nation; and (4) acts done in the exercise of military or naval authority. 1 Cooley on Torts (4 Ed.), 525, Section 151; Mundy v. Hoard,216 Mich. 478, 185 N.W. 872; 33 American Jurisprudence, 123, Section 125. The statement in the case at bar, published in the official argument upon the merits of an amendment to the Ohio Constitution proposed by the initiative process, does not fit with exactness into any of the foregoing classifications. In deciding, therefore, whether the doctrine of absolute privilege is to be applied to an official statement in this relatively new method of governmental action by initiative process, we must consider whether there is real similarity between the occasion here and those occasions in which absolute privilege more commonly obtains, and whether the fundamental reasons underlying all instances of absolute privilege are applicable here.
Two of the four established types of absolutely privileged occasions — the military or naval, and the judicial — by their nature offer little aid by way of analogy to the situation before us. With the executive and legislative privileges, however, the present circumstances have much in common.
The privilege accorded high executives of government, illustrated by such cases as Spalding v. Vilas, 161 U.S. 483,40 L.Ed., 780, 16 S.Ct., 631, Mellon v. Brewer,57 App. D.C., 126, 18 F.2d 168, 53 A. L. R., 1519, and Trebilcock v.Anderson, 117 Mich. 39, 75 N.W. 129, has been defined in 3 Restatement of Torts, 238, Section 591, as follows: *Page 581 
"The President of the United States and the Governor of any state or territory thereof, cabinet officers of the United States and the corresponding officers of any state or territory thereof are absolutely privileged to publish false and defamatory matter of another in the exercise of an executive function, if the matter has some relation to the executive proceeding in which the officer is acting."
It is to be observed that two executive officials of the state of Ohio, who are within that group of executive officials enjoying an absolute privilege as above stated, have specific duties enjoined upon them by Constitution and statute with respect to the official argument against a proposed Ohio constitutional amendment. The Governor, if the General Assembly is not in session, is to appoint the persons to prepare the argument against any such initiated proposal to amend the Constitution. The Secretary of State, having received the argument against the proposed amendment from those appointed to prepare it, is required to print it and distribute it to the electors of the state. In these acts both the Governor and Secretary of State are protected by absolute privilege against actions for defamation. It is in fact the Secretary of State who performs the important act of actually publishing the argument to the entire state, yet he may not be held responsible. Should the same protection be accorded the authors of the argument, appointees of the General Assembly or of the Governor, whose duty it is to prepare the official argument? If the argument were prepared by the Secretary of State, in addition to being published and distributed by him, would there be any doubt that no libel suit against him could be based upon statements therein contained? Why then should not those persons, appointed by the General Assembly or by the Governor to perform the important function of preparing the official argument to be sent *Page 582 
to the electors by the Secretary of State, have equal protection?
Cogent though the similarity is between the circumstances at bar and those constituting executive privilege, comparison with the legislative privilege is perhaps even more persuasive, inasmuch as the initiative process is basically a means of direct legislation. The immunity of legislators from actions for defamation arising out of the performance of their functions as members of the Legislature has, in a sense, a double source. In the federal Constitution and in many constitutions of the states, may be found a statement, similar to that appearing in Section 12, Article II of the Ohio Constitution, which reads:
"* * * for any speech, or debate, in either house, they [senators and representatives] shall not be questioned elsewhere."
But, as has been stated in 1 Cooley on Torts, 533, Section 154: "It is customary in the American constitutions to declare this exemption [of legislators] from responsibility in positive terms; but it exists independent of such a declaration as a necessary principle in free government; and this has been recognized ever since the case of the six members, whom an attempt was made to arrest and punish for their action in Parliament in the time of Charles the First."
Since the origin of the legislative immunity is rooted in the great heritage of the common law and the principles of free government, it is proper, we believe, to reason that those who are appointed to prepare the official argument upon a proposed constitutional amendment, although not within the express words of the constitutional statement of privilege — not being senators or representatives — may nevertheless enjoy in the performance of this official legislative duty an absolute privilege bottomed upon common-law principles. The Ohio constitutional provision must be deemed to recognize rather than restrict the existence *Page 583 
of occasions of absolute privilege, since the Ohio Constitution has no provision regarding privilege in judicial proceedings, which type of privilege nevertheless clearly exists in Ohio.Liles v. Gaster, 42 Ohio st., 631; Erie County Ins. Co. v.Crecelius, 122 Ohio St. 210, 171 N.E. 97.
The initiative procedure for amending the Ohio Constitution is, we believe, a legislative process in which the usual representative method of action is by-passed through direct action of the electors. Decision, instead of being made in the forum of the Legislature, is made in the forum of the electorate as a whole. Unfettered debate of the legislators upon the floor of the Legislature is a primary safeguard of representative democratic government. It is obvious that the official arguments, pro and con, upon the merits of direct, initiated legislation or constitutional change, were provided by Constitution and statute as a partial substitute for that safeguard of free debate in the legislative assembly. If the statement here complained of had been made by a legislator on the floor of the General Assembly, would any one doubt the existence of absolute privilege? Under the initiative process, the forum is extended to the state as a whole, and the method of communication to this larger forum, provided by Constitution and statute, is the appointment by the Governor or the General Assembly of the authors of the argument, which argument is then circulated by the Secretary of State to all the electors. Do we not have here all the elements upon which absolute legislative privilege is bottomed?
And what is this fundamental philosophy underlying the whole doctrine of absolute privilege? It is expressed in 3 Restatement of Torts, 224, Section 584, as follows:
"Privileges of the first class [absolute privileges] are based chiefly upon a recognition of the necessity that certain officials and others charged with the *Page 584 
performance of important public functions shall be as free as possible from fear that their actions may have an adverse effect upon their own personal interests. To accomplish this, it is necessary for them to be protected not only from liability but from the danger of even an unsuccessful civil action. This being so, it is necessary that the propriety of their conduct shall not be indirectly inquired into either by court or jury in civil proceedings brought against them for misconduct in office. Therefore, the privilege is absolute and the protection which it affords is complete. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the publisher. The absolute privilege of such officials to publish defamatory matter is a part of a general privilege which extends to all acts done by them in their official capacity which invade the interests of others." See, also, McAlister Co. v. Jenkins, 214 Ky. 802, 808,284 S.W. 88.
Further, in view of the enormous circulation of the official arguments to the electorate as a whole, and the consequent increase in the potential damages recoverable in libel actions, the fear of personal consequences would here be much stronger than in the ordinary case, and would the more tend to subdue the arguments. Facts and reasons boldly stated are necessary to give the people the basis of sound action. The importance and the publicity of these official arguments greatly enhance the possibility that a libel suit based upon such statements may be used as a political weapon in a heated campaign over the proposed constitutional change. To permit a court inquiry into the motives behind the statements in the official arguments, by a defamation suit, would destroy much of their value. It must be remembered that the electors will receive the arguments of both sides, a fact which in itself is a protection to the public. To cast serious reflection *Page 585 
upon one of these arguments, not in the immediate forum of public discussion, but in the more remote forum of the courts — perhaps not to reach a conclusion, as here, until long after the election — tends unnecessarily and unwisely to confuse the issues. The contest for or against any such proposal should be fought at the polls, and not be blurred by collateral attacks in courts of law. Applying the language of 3 Restatement of Torts, above quoted, "it is necessary for them [the authors of the official arguments] to be protected not only from liability but from the danger of even an unsuccessful civil action." The immunity should be given not to protect the defamer but to assure the people the benefits of forthright action by their representatives.
We accordingly conclude that the reasons underlying all occasions of absolute privilege, and the circumstances of those types of absolute privilege most closely allied to the present circumstances — the executive and the legislative privileges — all combine in favor of holding the doctrine of absolute privilege applicable to the present occasion.
The majority of the Court of Appeals, while apparently agreeing that the official argument should be protected by a privilege, concluded that the statement made in the course of the argument that plaintiff was a "paid lobbyist for the Single Tax Movement" was not within the immunity because it was not relevant to the public issue under consideration. In the words of the court, "The subject of consideration was the proposal, not Mr. Bigelow." Counsel for defendant Miniger make this holding the basis of one of their assignments of error in this court.
It is true that the doctrine of absolute privilege as developed in this country has had, in general, one principal restriction, that the statement be pertinent to the occasion of privilege. This is true of the judicial immunity (Hoar v. Wood,44 Mass. 193) and of the *Page 586 
executive immunity (Mellon v. Brewer, supra). Because, however, of the wording of the frequent constitutional provisions in this country to the effect that legislators, for what they may say in speech or debate in legislative halls, "may not be questioned elsewhere," the requirement of pertinence with respect to the legislative immunity has not had the same development. 1 Cooley on Torts, 533, Section 154. However, since we deem these express constitutional provisions not to be the primary source of the immunity we have found here to exist, we feel, that, in accordance with the development of the doctrine of absolute privilege in this country, the requirement of pertinence should be held applicable here.
In deciding what is the proper measure of such pertinence, many courts and the editors of the Restatement of Torts have adopted substantially the view stated in the recent case ofJohnston v. Schlarb (Wash.), 110 P.2d 190, at page 194:
"The great majority of the American decisions rendered since the decision in the Reifsnider case [Maulsby v. Reifsnider,69 Md. 143, 14 A. 505], have followed the suggestion therein made, and avoided using the word 'relevant' in stating the rule lest its use should give the mistaken impression that the privilege extends only to matters which are legally relevant.
"In determining whether or not matter spoken in the conduct of an action or contained in the pleadings is privileged, the test is not — Is it legally relevant? But — Does it have reference and relation to the subject-matter of the action?"
To the same effect see Maulsby v. Reifsnider, supra; Andrews
v. Gardiner, 224 N.Y. 440, 121 N.E. 341, 2 A. L. R., 1371. Similarly, 3 Restatement of Torts, 225 to 236, Sections 585, 586, 587, 589, in stating this requirement, uses, throughout, the broad language, "having some relation to."
The Court of Appeals in deciding that the alleged *Page 587 
defamatory statement did not satisfy the requirement of pertinence relied upon the Ohio case of Mauk v. Brundage,68 Ohio St. 89, at p. 97, 67 N.E. 152, 62 L.R.A., 477, in which it is said: "To be pertinent and material it [the privileged statement] must tend to prove or disprove the point to be established, and have substantial importance or influence in producing the proper result."
Whether the Mauk case states a more stringent rule than the one generally accepted by the courts of this country, and expressed above in the language of Johnston v. Schlarb, is not here material, since we have determined that the statement made in the present case satisfies both tests. The Court of Appeals in its opinion said that the statement in question had no pertinence to "the merit or demerit of the proposed amendment. Who may have proposed it, or what his personal connections may have been were immaterial and irrelevant, and were not within any privilege that may have attended a discussion of the advisability of the adoption of the Bigelow Amendment." We believe the court below was in error in thus restricting the scope of pertinence to the merits of the constitutional proposals. The test is — pertinence to the occasion of theprivilege. "Occasion" has long been a word of art used by the courts when dealing with the problem of absolute privilege. It connotes a wider range than the discussion merely of the merits of the central issue. An occasion of privilege is the product of many factors. The factors of the present occasion consist not only of the abstract merit of the constitutional proposals, but also the steps in the initiative process — the election upon the constitutional issues, the considerations influencing the decision of the electors at the polls, and the action of the temporary officials who aid in that decision by the preparation of the official argument against such proposals. To limit pertinence to the abstract, laboratory-tested merits of the constitutional *Page 588 
amendments would unnecessarily restrict those who prepare the official argument, forcing them to keep silent upon many aspects logically important in influencing the vote of the people. Can it be held that the identity of the sponsor of these amendments, his public activities and economic beliefs, have no relation to the determination to be made by the electors? The answer is found in the very allegations of the plaintiff's amended petition where it is stated that the amendments were "popularly known as the Bigelow Amendments." If the name of the plaintiff was so intimately connected with the proposals as to have the public refer to them as the "Bigelow Amendments," it is logical to suppose that the voters would be interested in the public activities and economic background of the sponsor. While it is very well to say the merits of any proposal should be considered abstractly, it is nevertheless true that, especially in the heat of a campaign, the affiliations and background of the sponsor of any proposal is thought by many voters to be of equal if not greater interest. Commonly the first question asked respecting any such proposal is "Who is its sponsor?" In influencing decision by the electors, the answer to this question is of vast importance. We accordingly hold that the statement here made with respect to the plaintiff was pertinent and relevant to this occasion of absolute privilege.
The conclusion that the official argument was privileged and that the alleged defamatory portion of it was pertinent to the occasion of the privilege, brings us to a further question not discussed by the Court of Appeals: What persons are protected by the privilege? Even though the three official appointees, Brumley, Mansur and Skinner, might have an immunity for what was said in the official argument, does such protection extend to the defendant Miniger, who was not an official appointee, but is only alleged to have conspired and combined his efforts with those who were. *Page 589 
Can he, too, claim the benefit of the absolute privilege by pointing out that the only publication of the alleged defamatory matter was over the names of persons who were within the immunity?
We believe that the reasons above developed for concluding that there exists an absolute immunity for the official appointees, do not warrant the extension of the privilege to persons having no such official position. The public interest in an unfettered and bold presentation of the argument against a proposed constitutional amendment does not require that persons alleged to have acted in concert with the appointees, but having no official authority to do so, should be insulated from liability for their participation in a claimed conspiracy to defame the plaintiff. Each participant in a conspiracy to defame may be held liable for the defamatory statements of any of his co-conspirators published in furtherance of the common design. Schoedler v. Motometer Gauge Equipment Corp.,134 Ohio St. 78, 15 N.E.2d 958. And we are of the opinion that co-conspirators cannot shelter themselves behind the absolute privilege which a paramount public interest happens to have conferred upon those members of the conspiracy in whose name the defamatory matter was published.
Strong support for this conclusion is found in Rice v.Coolidge, 121 Mass. 393, 23 Am. Rep., 279, where it was held that, although witnesses would themselves enjoy an absolute immunity for defamatory statements made in the course of judicial proceedings, an action would still lie against defendants charged with conspiring to defame the plaintiff by suborning such witnesses to give false testimony. In that case, as in the one at bar, the actual publication of the defamatory matter was through the agency of persons absolutely privileged. The court stated, in its opinion, p. 396: "The perjured witness and the one who suborns him are joint tortfeasors, acting in conspiracy or combination *Page 590 
to injure the party defamed. The fact that one of them is protected from a civil suit by a personal privilege does not exempt the other joint tortfeasor from such suit." See, also,Ewald v. Lane, 70 App. D.C., 89, 104 F.2d 222.
We accordingly conclude that, even though it be held that the doctrine of absolute privilege applies to the official argument and may be invoked by those who were appointed to compose it, and further held that the alleged defamatory statement in the official argument was relevant to the occasion of the privilege, nevertheless, appellant's second assignment of error in this court is not well taken because appellant does not come within the claimed privilege.
This brings us to the defendant's other assignment of error, that "The characterization of Herbert S. Bigelow as a 'paid lobbyist for the Single Tax Movement' did not present a question of fact for the jury to determine as to whether such language is libelous." The trial judge expressed the belief that this statement could not be considered libelous under any circumstances. The majority of the Court of Appeals, however, held that the import of the words was sufficiently uncertain to justify submission to a jury of the question whether the words were in fact understood in a defamatory sense. That court also concluded that it could not be said as a matter of law that the language used could not sustain the defamatory meaning imputed to it by the plaintiff.
In any action for defamation, the court must determine whether the words are reasonably capable of any defamatory meaning, and, if so and if no legally sufficient special damage is alleged, whether the words are actionable per se. ClevelandLeader Printing Co. v. Nethersole, 84 Ohio St. 118,95 N.E. 735. 3 Restatement of Torts, Sections 614 and 615. Only if these questions are answered by the court in the affirmative is there any question for a jury. Moreover, as stated *Page 591 
in 3 Restatement of Torts, 305, Section 614, Comment c. "Such issues, being questions of judgment, are more frequently determined finally by the court than issues which involve only the determination upon conflicting evidence of questions of fact."
Plaintiff seeks to bring the alleged defamatory statement within two of the familiar categories of words actionableper se if spoken orally (Davis v. Brown, 27 Ohio St. 326), anda fortiori if printed (Watson v. Trask, 6 Ohio, 531): First, that the words tend to injure the plaintiff in his calling or profession; second, that they impute to him the commission of an indictable offense involving moral turpitude.
In connection with the first category, plaintiff alleges as inducement that "for a period of years exceeding twenty he has been a minister of the gospel, and has been held in good repute by his congregation and the persons with whom he has come in contact." We are of the opinion that, under the circumstances disclosed in the amended petition, the fact that the plaintiff is a clergyman should not entitle him to special consideration. It is, of course, true that words that will adversely affect a man in his occupation are relative to the nature of that occupation. Words that might cause great harm to a clergyman in his calling would not do so to a non-professional man. In the present case, however, the amended petition shows that plaintiff had not restricted his activity to his ministry, but had entered the political arena as author of the "Bigelow Amendments." Free discussion of public issues and the cherished right to criticize political figures, cannot properly be curtailed on the claim that in his private capacity such a political participant pursues a calling in which even the slightest personal criticism may work him harm.
Further, it is apparent that the statement complained of what was not written about the plaintiff with regard to his activities as a member of the clergy. It *Page 592 
has been held by this court that "Words, charging a clergyman with drunkenness, when spoken of and concerning him in hisoffice or calling, are actionable per se." Hayner v. Cowden,27 Ohio St. 292. (Italics ours.) In the case at bar, the statement that plaintiff was a "paid lobbyist for the Single Tax Movement" was not published of and concerning the plaintiff as a clergyman, but as sponsor of the "Bigelow Amendments."
Nor does the statement complained of impute to the plaintiff the commission of an indictable offense. Plaintiff does not allege even by way of innuendo that the statement would be understood to charge a crime. Criminal lobbying in Ohio is limited by Sections 6256-1 to 6256-8, General Code, tounregistered lobbying before the General Assembly; impliedly all other lobbying is not criminal. Here there is no allegation suggesting that plaintiff was being charged with being unregistered, or, if so, of lobbying before the General Assembly. The amended petition plainly fails to state a claim upon which a jury could find that defendant Miniger had conspired to publish words which could be understood to accuse plaintiff of an indictable offense.
Finally, do these words fall into that necessarily vague and indeterminate class of language that tends to subject a person to public hatred, ridicule, or contempt? It is generally agreed that such words are actionable per se if written, though not if spoken orally. State v. Smily, 37 Ohio St. 30. In determining the legal effect of such words, the present plaintiff, for reasons already stated, must be considered as any other ordinary citizen and not as enjoying any special consideration as a clergyman.
The plaintiff is said to be a "paid lobbyist." In this state, that is a perfectly legal and proper activity. To lobby legally before the General Assembly, certain statutory requirements must be fulfilled. It is not suggested *Page 593 
that plaintiff has not complied with these. In the case ofFoot v. Pitt, 83 App. Div. 76, 82 N.Y. Supp., 464, the court held that it was not defamatory per se to say that the plaintiff had been to the state Legislature to secure the passage of an act that would benefit him at the expense of the public. We do not believe that the fact that in the case at bar the plaintiff is charged with lobbying for pay in furtherance of a political and economic movement, rather than on his own behalf, changes the legal consequence. There is nothing immoral or disgraceful in accepting pay to influence in a legitimate manner the deliberations of a legislative body.
The plaintiff has alleged by way of innuendo that the statement implied that he was "connected with a tax movement which was opposed to the best interests of the people," and that the "term 'lobbyist,' in common parlance and as used by the defendants herein, indicates a person of ill repute, who would work for any interest, whether good or bad, if compensated according to his price." A demurrer to a petition in an action for libel admits the truth of only so much of the innuendo as is warranted by the natural meaning of the language used in the publication. Shallenberger v. Scripps PublishingCo., 8 N. P. (N.S.), 633; affirmed, Shallenberger v. ScrippsPublishing Co., 17 C. C. (N.S.), 546, 32 C. D., 283; affirmed without opinion, Shallenberger v. Scripps Publishing Co.,85 Ohio St. 492, 98 N.E. 1132. As stated in 3 Restatement of Torts, 149, Section 563, Comment f: "The function of the innuendo is explanation; it cannot change or enlarge the sense or meaning of the words. It can only explain or apply them in the light of the other averments in the declaration." See, also, Tappan v. Wilson, 7 Ohio, 190. The plaintiff here has made no averments of extrinsic facts or circumstances that would give the words any covert meaning not ordinarily applied to them. *Page 594 
Our conclusion is that the plaintiff's petition has failed to state a cause of action for defamation per se. Plaintiff, however, contends that, even if this be true, his amended petition alleges such special damage as to support an action for defamation per quod. This alleged special damage consists of the expenditure by the plaintiff of upwards of $1,000 for legal counsel, radio time, stenographic assistance, telegrams, etc., to refute and deny the alleged defamatory statement.
We are satisfied that this item of special damage is not sufficient to make the statement defamatory per quod if not otherwise actionable. Plaintiff's allegations do not show any loss or injury actually suffered as a direct consequence of an impaired reputation. They at most show that plaintiff was apprehensive lest, as a result of the statement concerning him, some third persons might alter their relations with him to his disadvantage, and not that any third persons in fact did. As stated in 3 Restatement of Torts, 185, Section 575, comment b, special damage "must result from conduct of a person other than the defamer or the one defamed * * *." Here the only special harm alleged is entirely the result of the plaintiff's own conduct in causing money to be expended to deny and refute the statement. The plaintiff in a libel action has the right to try to mitigate damages, and, if his cause of action can be independently established, may recover for sums reasonably expended in this effort. But he may not pull himself up by his own boot straps, and by such expenditures create a cause of action for himself where one did not otherwise exist. DenNorske Ameriekalinje Actiesselskabet v. Sun Printing Publishing Assn., 226 N.Y. 1, 122 N.E. 463.
Although we have held that the defendant Miniger is not protected by an absolute privilege, we conclude that no cause of action has been stated against him since the statement which he allegedly conspired to publish was not defamatory per se, and the plaintiff *Page 595 
has failed to allege any legally sufficient special damage. The judgment of the Court of Appeals should accordingly be reversed. We cannot, however, directly affirm the judgment of the Court of Common Pleas, which directed that the amended petition be "dismissed as to all defendants." As hereinabove pointed out, only the defendant Miniger's rights are before us for adjudication. Therefore we reverse the judgment of the Court of Appeals and affirm the judgment of the Court of Common Pleas as to the defendant Clement O. Miniger.
Judgment reversed.
WEYGANDT, C.J., TURNER, MATTHIAS, HART and ZIMMERMAN, JJ., concur.
WILLIAMS, J., concurs in paragraphs 2, 3 and 4 of the syllabus and is of the opinion that the judgment of the Court of Appeals should be reversed and that of the Court of Common Pleas affirmed.