John H. NIX, Plaintiff–Appellant,

v.

Patrick J. O'MALLEY; Weston, Hurd, Fallon, Paisley & Howley, Defendants–Appellees.

Nos. 97–4086, 97–4165.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 25, 1998.

Decided Nov. 16, 1998.

Harold Pollock (argued and briefed), Harold Pollock Co., LPA, Cleveland, OH, for Appellant.

David C. Lamb (argued and briefed), Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Patrick M. McLaughlin (argued and briefed), John F. McCaffrey (briefed), McLaughlin & McCaffrey, LLP, Cleveland, OH, for Appellees.

Before: KENNEDY and BOGGS, Circuit Judges, and WEBER,* District Judge.

BOGGS, Circuit Judge.

In 1994, an as-yet-unidentified party intercepted John H. Nix's cordless telephone calls. In a public court filing, Patrick J. O'Malley and the Cleveland law firm of Wes-

---

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

ton, Hurd, Fallon, Paisley & Howley ("Weston, Hurd") disclosed the substance of the intercepted communications, and Nix sued. The district court granted summary judgment for O'Malley and Weston, Hurd, dismissing Nix's three claims. We affirm the district court's disposition of counts two and three, which alleged violations of Ohio's Corrupt Activities Act and which accused Weston, Hurd of legal malpractice. We reverse the grant of summary judgment on Nix's first count, insofar as the district court disposed of Nix's claim that O'Malley and Weston, Hurd violated Ohio's wiretap laws when they publicly disclosed certain contents of the intercepted communications.

## I. Background

This case stems from a neighborhood dispute over plans to develop a vacant lot on Brookside Drive in Cleveland. In August 1993, John H. Nix moved into the home of Dr. John Master. Master, an elderly widower, lived on Brookside Drive, located in a relatively affluent neighborhood. Nix's girlfriend, Rebekah Deamon, who worked in Master's home, had introduced the two men, who soon formed a partnership to build homes on nearby undeveloped land owned by Master. The proposed development upset some neighborhood residents who opposed further construction and feared that Nix was taking advantage of the aged doctor.

In November 1993, Nix approached Patrick J. O'Malley, an attorney and Cleveland City Councilman whose ward included Brookside Drive. Nix sought O'Malley's support of a tax abatement for the development, but O'Malley declined, explaining that he favored abatements only for economically distressed areas. Soon after this discussion, two Brookside Drive residents contacted O'Malley about Master and the development. Jack G. Sword asserted that Master had previously promised the undeveloped land to him. Another neighbor expressed concern because Master no longer returned her phone calls. These conversations prompted O'Malley to have the Cleveland police visit the Master household; the Fraud Unit investigated, found Master lucid and competent, and ceased its inquiries.

In December, O'Malley attended a heated neighborhood meeting about the proposed development—a gathering that engendered a defamation lawsuit by Nix and Master against neighbor Jack Sword and his wife. While an insurance company defended the Swords in the defamation suit, O'Malley served as Jack Sword's personal counsel. Given the lawsuit and the contested development plans, neighborhood tensions predictably escalated. It is undisputed that, during February and March of 1994, someone intercepted and taped Nix's cordless telephone conversations at the Nix/Master residence. The interceptor acted without a warrant and without consent from the parties to the conversations. In late March, Nix gained possession of four cassette tapes that contained recordings of his conversations.

After Nix learned of the taping, he and Master brought suit in federal district court in Cleveland on April 22, 1994, naming the Swords and O'Malley among the several defendants. That case, *Master v. Sword*, No. 1:94CV849, is still pending. One year later, Master's accountant, William Weinkammer, filed a related suit; in *Weinkammer v. Sword*, No. 1:95CV0820, Weinkammer sued, among others, Sword and O'Malley, claiming that he had been a party to some of the intercepted telephone calls. In both *Master* and *Weinkammer*, the plaintiffs alleged that the defendants conspired to wiretap Nix's phones and to use the information gained from the interception to block the partnership's housing development.

Neither of these suits form the basis for this appeal, but the instant case stems from the defendants' actions in *Master* and *Weinkammer*. In those complaints, Nix and Weinkammer sought relief under various theories, including federal and state wiretap laws, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2520, and Ohio's related law, OHIO REV.CODE ANN. §§ 2933.51–2933.65 (Banks–Baldwin 1998).[1] These wiretap laws prohibit more than the placing of wiretaps,

---

1. Nix sued under the 1994 versions of the state and federal laws, although Congress amended Title III in 1994, and Ohio's legislature amended its wiretap law in 1996.

because they forbid both the interception of certain communications—even if the interceptor does not use or disclose the contents of the communication—and the use or disclosure of the contents of the communication—even if the user or discloser did not intercept the communication.[2] *See* 18 U.S.C. § 2511; OHIO REV.CODE ANN. § 2933.52 (Banks–Baldwin 1998). In *Master* and *Weinkammer*, the plaintiffs alleged that the defendants both intercepted the communications and used and disclosed the contents of the communications.

When confronted with the lawsuits, O'Malley retained Weston, Hurd to assist in his defense. He denied involvement in any conspiracy or wiretapping, although he admitted that he had heard portions of a recording that probably contained the intercepted communications. In a later affidavit, prepared on June 13, 1996, O'Malley explained his exposure to the intercepted communications:

28. Sometime [in early 1994], Officer Sue Sazima of the Cleveland Police Department's Street Crimes Unit, called me and requested that I come downtown to Police Headquarters to listen to some tapes. Officer Sazima stated that I may be the object of a blackmail and extortion scheme.

29. When I arrived at the Cleveland Police Department's Headquarters, Officer Sazima told me that the Organized Crime Unit was listening to the tapes.

30. Naturally, I was greatly concerned at the suggestion of threats from individuals involved in organized crime.

31. Later, the same day, the tapes became available and Officer Sazima played about ten minutes of tape for me. The tape recorded conversation was between two males, neither of whom were recognizable to me by voice.

32. Upon listening to the tapes, my concern was relieved, [sic] I did not care to pursue the matter further.

33. I assumed that because I was requested to come to police headquarters to listen to tapes that were in police possession, that the tape recordings had been obtained through a lawful investigation.

34. To this day I do not know who made the tapes or why they were made.

Nix, who also named Sazima as a co-conspirator, asserts without contradiction that the tape played for O'Malley contained a recording of Nix's intercepted conversations.

The plaintiffs in *Master* filed a motion in limine to prevent the *Master* defendants from using copies of the tape recordings when preparing their defenses. The district court denied the motion, and O'Malley then disclosed to his attorneys at Weston, Hurd the contents of the recorded conversations. Weston, Hurd prepared O'Malley's defense, and, on November 27, 1995, filed summary judgment motions in both *Master* and *Weinkammer*. The two motions, filed in the public record, each attached an affidavit by O'Malley that differs from the one reprinted in the previous paragraph in that the filed affidavit contained two paragraphs—31 and 32—that disclosed certain contents of the intercepted communications.[3]

---

**2.** This simplification glosses over two issues unimportant to this appeal. First, Nix's cordless telephone calls did not enjoy federal protection when intercepted in early 1994. Title III did not protect cordless telephone communications until Congress amended it by passing the Communications Assistance for Law Enforcement Act on October 24, 1994. *See* 108 Stat. 4279 § 202. This action did not have retroactive effect. *See, e.g., McKamey v. Roach*, 55 F.3d 1236, 1240–41 (6th Cir.1995). State law protected his conversations, however, because of the Ohio Supreme Court's December 1994 decision construing the Ohio statute as protecting cordless communications. *See State v. Bidinost*, 71 Ohio St.3d 449, 644 N.E.2d 318 (Ohio 1994). In this case, Nix alleges violations of Ohio, not federal, law. Second, while Title III prohibits the use *or* disclosure of the contents of illegally intercepted com-

munications, *see* 18 U.S.C. § 2511(1)(c)-(d), Ohio law initially only forebade "disclosure," *see* OHIO REV CODE. ANN. § 2933.52(A)(3) (Banks–Baldwin 1998) (reprinting the pre-amendment version), until a 1996 amendment altered the prohibition to delete "disclosure" and to substitute the term "use." *See* OHIO REV.CODE ANN. § 2933.52(A)(3) (Banks–Baldwin 1998). For reasons discussed at note 4 *infra*, the parties to this appeal interpret Title III and the Ohio law as identical.

**3.** Ohio and federal wiretap statutes broadly define "contents," prohibiting more than verbatim reproductions of conversations. *See* 18 U.S.C. § 2510(8) (" '[C]ontents', when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport or meaning of that communica-

Soon after, on December 27, 1995, Nix filed a complaint in Ohio state court. The first count alleged that O'Malley and Weston, Hurd violated Ohio's state wiretap law. (Because federal law did not protect cordless telephone calls when the interception occurred, Nix does not claim that the defendants violated Title III.) Unlike *Master* and *Weinkammer*, this lawsuit did not seek relief for an act of wiretapping. Instead, Nix alleged that the defendants violated the law by using and disclosing the contents of the communications on three separate occasions:[4] when O'Malley disclosed the contents of the tape to Weston, Hurd after the district court denied Nix's motion in limine for a protective order; when Weston, Hurd used the contents of the tape in preparing O'Malley's defense; and when O'Malley and Weston, Hurd filed O'Malley's affidavit with the motions for summary judgment in the *Master* and *Weinkammer* cases.

The second count alleged that the defendants conspired to aid and abet others in the concealment of the wiretapping and that the defendants withheld from discovery unprivileged statements about the wiretapping to avoid civil and criminal liability. This claim sought relief under RICO, 18 U.S.C. § 1964, the Ohio Corrupt Activities Act, OHIO REV. CODE ANN. §§ 2923.51–2923.66 (Banks–Baldwin 1998), and Ohio's obstruction of justice law, OHIO REV.CODE ANN. §. 2921.32 (Banks–Baldwin 1998). The third count alleged that Weston, Hurd—which has never represented Nix—breached a common-law duty to him by assisting O'Malley in committing unspecified crimes and intentional torts against Nix. Nix termed this claim "Legal Malpractice."

O'Malley and Weston, Hurd removed the case to federal court on the basis of the RICO claim, which Nix later removed from his complaint by amendment, although he never made good on his threat to move to

remand the case to state court. The district court granted the defendants' motions for summary judgment on all three counts.

## II. Standard of Review

■ We review the district court's grant of summary judgment de novo, applying the standards used by the district court. *See Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir.1992). Summary judgment is proper if the evidence submitted shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 250 (6th Cir.1994). We consider all facts and inferences drawn therefrom in the light most favorable to the non-moving party. *See ibid.* The non-moving party cannot rely on conclusory allegations to counter a motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990). The district court therefore properly granted summary judgment on Nix's second and third claims, which rely on nothing but unsupported, unsworn allegations in his complaints and briefs.

## III. Use and Disclosure of the Contents of a Communication Intercepted Illegally

The district court's disposition of Nix's first claim merits inquiry. This claim alleged violation of Ohio's wiretap law by O'Malley and Weston, Hurd's use and disclosure of the contents of the intercepted communications. As of 1995, when the three alleged violations occurred, Ohio law provided that:

(A) No person purposely shall do any of the following:

. . .

---

tion. . . ."); OHIO REV.CODE ANN. § 2933.51(G) (Banks–Baldwin 1998) ("Contents," when used with respect to a wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of the communication.").

4. Believing that Title III may preempt some state laws, the parties to this appeal interpret Ohio's law as comparable to Title III, thus reading into

it a prohibition on both "use" and "disclosure." *See* note 2 *supra* (discussing Ohio wiretap law provisions). Whatever the merit of this approach—and we take no position on it—as shown below, if Ohio law prohibited "use" when Weston, Hurd prepared O'Malley's defense by using the intercepted contents of Nix's communications, an implied exception to the statute sanctioned the firm's use of the contents.

(3) Disclose, or attempt to disclose, to any other person the contents, or any evidence derived from the contents, of any wire or oral communication, knowing or having reason to know that the contents, or evidence derived from the contents, was obtained through the interception of the wire or oral communication in violation of sections 2933.51 to 2933.66 of the Revised Code.

Ohio Rev.Code Ann. § 2933.52(A) (Banks–Baldwin 1998) (reprinting the law before its 1996 amendment). Section 2933.65 permits civil actions by parties to the intercepted communications. See Ohio Rev.Code Ann. § 2933.65 (Banks–Baldwin 1998) (reprinting the pre-amendment text). In 1996, Ohio replaced section 2933.52(A)(3)'s prohibition on "disclosure" with a prohibition on "use," but, as discussed in note 4 supra, the district court and all parties have consistently interpreted § 2933.52(A)(3) to prohibit both use and disclosure, thereby mirroring federal Title III's scope of protection. See 18 U.S.C. § 2511(c)-(d). Nix alleged violations stemming from two "disclosures" and one "use" of the contents of the intercepted communications: O'Malley's June 1995 disclosure to Weston, Hurd to assist in preparing his defense, following the Master court's denial of Nix's motion in limine to prevent disclosure; Weston, Hurd's use of the contents when preparing O'Malley's defense in the Sword and Weinkammer cases; and O'Malley and Weston, Hurd's disclosure in the affidavits attached to the summary judgment motions filed in Master and Weinkammer.

O'Malley and Weston, Hurd admit the use and disclosures. The district court granted summary judgment for O'Malley and Weston, Hurd, however, finding that they did not "know or have reason to know" of the illegality of the interception, and thus did not violate Ohio law. It further held that, even if the defendants knew of the illegality, an implied privilege permits use and disclosure in the course of preparing a defense to claims of violating wiretap laws. We review these rulings in turn.

### A. Knowing or Having Reason to Know

■ Ohio wiretap law—treated by the parties as equivalent to Title III—outlaws the use and disclosure of the contents of intercepted communications only when a person acts "knowing or having reason to know" that the information was obtained illegally. See 18 U.S.C. § 2511(1)(c)-(d); Ohio Rev. Code Ann. § 2933.52(A)(2), (3) (Banks–Baldwin 1998). This establishes two preconditions to a finding of liability: the interception must have violated the law, and the defendant must have known or had reason to know this when he disclosed the contents of the intercepted communication. Both Title III and its Ohio counterpart explicitly allow some interceptions (for example, recordings pursuant to valid warrants, or with the consent of a party to the conversation), and neither statute forbids disclosures of the contents of legally intercepted communications. See 18 U.S.C. § 2511(2); Ohio Rev.Code Ann. § 2933.52(B) (Banks–Baldwin 1998).

■ This does not mean, however, that O'Malley and Weston, Hurd enjoyed a license to disseminate the contents of Nix's communications until a court conclusively ruled that the initial interception violated the law. Such an interpretation contravenes common sense and the law of this circuit. See, e.g., Fultz v. Gilliam, 942 F.2d 396 (6th Cir.1991) (impliedly finding that Title III punishes disclosures that predate a conclusive judicial determination of illegality). Here, despite investigation by the FBI and the Cleveland police department, the interceptor remains undiscovered. Further, no court has directly held that the interception violated state or federal law. O'Malley and Weston, Hurd cannot credibly deny, however, that the unidentified interceptor probably violated the law. No party is known to have consented to the recordings, and the Cleveland police department denies the existence of a valid warrant. Ohio law prohibits the interception of cordless telephone communications, see State v. Bidinost, 71 Ohio St.3d 449, 644 N.E.2d 318 (Ohio 1994), thus protecting Nix's cordless calls from recording. Finally, although it bears only on the question of illegality, and not of notice, when the Ohio Supreme Court heard Nix's petition for a writ of mandamus brought to permit the inspection of police records relating to the

interception, the court noted in dicta that the police records showed that the interception violated Ohio's wiretap law. *See State ex rel. Master v. City of Cleveland,* 76 Ohio St.3d 340, 667 N.E.2d 974, 975 (Ohio 1996).

■ To defeat a motion for summary judgment, Nix must show that he produced more than a scintilla of evidence that not only did the taping violate the law, but also that O'Malley and Weston, Hurd knew or had reason to know of this illegality when they used and disclosed the contents of the communications. The district court found for O'Malley and Weston, Hurd, ruling that Nix's "mere allegations" of illegality did not establish that the defendants knew or had reason to know that the interception violated the law. After reviewing the record, we are convinced that Nix has made a sufficient showing to create an issue of fact that, at least when O'Malley and Weston, Hurd disclosed certain contents of the communications in their motions in the *Master* and *Weinkammer* cases, they had reason to know that the interceptor violated Ohio law by recording Nix's cordless telephone calls.

■ Resolving this question requires looking at the evidence available to the court below and deciding whether it could establish a basis for a jury finding that the defendants had reason to know of the illegal source. Without delving into abstruse epistemological questions about when a person has reason to know of a fact, we think it evident that the trier of fact may rely on circumstantial evidence to prove "reason to know." *See United States v. Wuliger,* 981 F.2d 1497, 1504 (6th Cir.1992) (discussing Title III's "reason to know" requirement and finding it satisfied by an examination of circumstantial evidence regarding whether a defendant has reason to know of a fact), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994). Thus, O'Malley cannot escape liability merely by claiming he did not believe the interception occurred illegally; he therefore offers relevant, but not dispositive, evidence in his affidavit of June 13, 1996 by stating that "I assume that because I was requested to come to police headquarters to listen to tapes that were in police possession, that the tape recordings had been obtained through a lawful investigation." While we agree that that assumption was reasonable and that there is no evidence in the record that rebuts O'Malley's affidavit with respect to what he knew when he heard the tapes in 1994, a jury can find that, when he disclosed the contents of the tapes in November 1995, he had reason to know of the illegality of the interception.

In early 1994, Officer Sazima summoned O'Malley to the Cleveland police station and played a recording for him. O'Malley and Weston, Hurd did not disclose the contents of the tapes in open court filings until November 27, 1995. Nix presented evidence to the district court that provides a basis for finding that, as of the time of the disclosure, the defendants had reason to know that the interception violated the law. In the interim, Nix and Weinkammer filed two federal lawsuits naming O'Malley as a defendant and claiming that O'Malley conspired with other defendants to wiretap Nix's phones and to disseminate the intercepted conversations, in violation of federal and Ohio wiretap law. In January 1995, Nix filed a "Communication" with the *Master* court, describing the Ohio Supreme Court's recent ruling in *State v. Bidinost,* 71 Ohio St.3d 449, 644 N.E.2d 318 (Ohio 1994). *Bidinost* construed Ohio's wiretap statute to protect cordless telephone communications such as Nix's; Nix argued that this ruling eliminated any grounds for finding that the recording was legal, as no warrant has surfaced and no party consented to the taping.

■ Nix's offerings do not *establish* that the interception was illegal or that the defendants had reason to know of the illegality. Further, Nix cannot overcome summary judgment merely by showing that it was "reasonably foreseeable" that the interception occurred illegally. *See Wuliger,* 981 F.2d at 1504 (requiring a focus on the "defendant's reason to know" rather than on reasonable foreseeability). Rather, Nix must show that the defendants knew "1) [that] the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant[s] could, with presumed knowledge of the law, determine that the interception was prohibited in

light of Title III [or Ohio law]." *Thompson v. Dulaney,* 970 F.2d 744, 749 (10th Cir.1992).

Nix's evidence satisfies this burden, as it permits a jury to infer that the defendants had reason to know of the source's illegality when O'Malley and Weston, Hurd disclosed the contents of the intercepted communications. The district court dismissed Nix's proof as "mere allegations," but here the "allegations" serve a dual role: as allegations of illegal wiretapping in two federal complaints (*Master* and *Weinkammer*) and, for this appeal, as circumstantial evidence of the defendants' knowledge of the illegal interceptions. Of course, all wiretap plaintiffs must rely on "mere allegations" when bringing claims, as the trial court resolves the legality of the interception at the same time it determines the legality of subsequent uses or disclosures. Nix had no recourse apart from "mere allegation"—no court had conclusively held that the taping occurred illegally.

In context, Nix's "mere allegations" provide credible evidence that, when the defendants disclosed certain contents of the communications, they had reason to know that the communications were obtained in violation of Ohio law. Nix and Weinkammer both sued O'Malley for conspiracy to wiretap; O'Malley and Weston, Hurd had over a year to prepare a defense against the allegations of wiretapping; the plain language of the statute is clear; and Nix offered support for his contentions that, even if he could not prove who intercepted his phone calls, Ohio law prohibits all interceptions except for rigidly defined exceptions, and no exception applied here because no warrant had issued and no party had consented to the interception. In short: an interception occurred. Ohio law forbids all interceptions, with enumerated exceptions. Nix showed that the three most likely exceptions (cordless telephone calls, warrants, consent) did not apply. Nix presents a genuine issue of material fact as to whether the defendants had reason to know of the illegality of the communication.[5]

**B. Proposed "Adjudication" & "Defense" Exceptions**

The district court also found that O'Malley enjoyed a privilege to disclose the contents of the communications to his attorneys at Weston, Hurd to assist in the defense of the wiretap claims in *Master* and *Weinkammer.* Keeping in mind that Nix alleges three different violations of Ohio's wiretap law (one disclosure by O'Malley to Weston, Hurd to prepare his defense; one use by Weston, Hurd to prepare the defense; and one disclosure by both defendants in the motions for summary judgment in *Master* and *Weinkammer*), we now consider the legitimacy and boundaries of unwritten privileges in Title III and Ohio's wiretap law.

Ohio and federal wiretap law explicitly permit disclosures in certain instances (pursuant to valid warrants, for example), but their plain language allows no further exceptions. *See Fultz v. Gilliam,* 942 F.2d 396, 402 (6th Cir.1991) (explaining that Title III forbids that which it does not expressly allow). While this circuit has recognized unwritten exceptions to Title III, it has drawn them very narrowly. For example, despite the language of Title III, we have permitted the use of illegally obtained wiretap evidence for impeachment, but we have limited this to use by the government in criminal cases. *See United States v. Wuliger,* 981 F.2d 1497, 1506 (6th Cir.1992), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); *see also United States v. Murdock,* 63 F.3d 1391, 1400 (6th Cir.1995) (refusing to expand Title III's "extension telephone" exemption to cover interception by former spouse), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996); *Fultz,* 942 F.2d at 400–02 (rejecting an implied "single publication" limit to Title III, finding actionable each disclosure to a different third party). *Murdock*'s other holding, recognizing a "clean hands" exception that permits the government to use the contents of illegal interceptions if it played no role in the interception,

---

**5.** While Weston, Hurd does not merit "special treatment" under wiretap laws because of its status as a law firm, the jury may take into account an attorney's professional duties when deciding if the firm had reason to know of the illegal source. *See Wuliger,* 981 F.2d at 1505 (explaining that "[a]lthough an attorney must not turn a blind eye to the obvious, he should be able to give his clients the benefit of the doubt").

has been the target of a vigorous dissent in a case that relied on *Murdock,* but which has since been vacated. *See Doe v. SEC,* 86 F.3d 589, Nos. 95–5862, 95–6625, 1996 WL 327558, at **10–11 (6th Cir.) (Merritt, C.J., dissenting), *vacated and withdrawn,* 86 F.3d 599 (6th Cir.1996); *see also Smith v. SEC,* 129 F.3d 356 (6th Cir.1997) (en banc) (vacating district court injunction without discussing *Murdock* ).

The protection of privacy—one of the purposes of Title III and Ohio's law—requires strict controls on the repetition of the contents of illegally intercepted communications. *See Gelbard v. United States,* 408 U.S. 41, 52, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972); *Murdock,* 63 F.3d at 1403; *Fultz,* 942 F.2d at 402 ("Each time the illicitly obtained recording is replayed to a new and different listener, the scope of the invasion widens and the aggrieved party's injury is aggravated."); *State v. Thomas,* Nos. 88 CA 22, 88 CA 29, 1989 WL 74879, at *5 (Ohio Ct.App. June 28, 1989) (unpublished) ("The invasion of privacy is not a one time occurrence. Every time the contents of the illegally intercepted conversation are disclosed, the person will suffer a further invasion of privacy."), *jurisdictional motion overruled,* 46 Ohio St.3d 707, 545 N.E.2d 1280 (Ohio 1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). Courts must keep this statutory purpose in mind when construing the wiretap laws to permit the republication of illegally acquired information.

■ The district court ruled that O'Malley had a privilege "to disclose to Weston, Hurd attorneys what he heard on the taped conversation in an effort to assist in the defense of the claims made against him." We will refer to this implied exception to Ohio and Title III's prohibition on disclosure as the "defense exception." This privilege seems a necessary element of wiretap law; as one court has observed, "To deny defendants' counsel any possibility of investigating or rebutting the allegations on which [a] claim for punitive damages is based, or of discussing the contents of the tapes with their clients in the course of preparing a defense of [a] lawsuit, would be to convert the allegations of the complaint into a judg-

ment." *McQuade v. Michael Gassner Mechanical & Elec. Contractors, Inc.,* 587 F.Supp. 1183, 1190 (D.Conn.1984).

■ While the district court's opinion refers only to O'Malley's *disclosure,* we think it self-evident that this privilege extends to *use* by the defendant and his counsel in the course of preparing a defense against charges of violating state or federal wiretap laws. We hold that, at least here, where a plaintiff filed a complaint alleging violations of wiretap laws, and where the district court denied plaintiff's motion for a protective order foreclosing use of the tapes in the defense, the defendant may disclose to his attorneys the contents of intercepted communications, and the defendant and attorneys may use the contents to prepare a defense to the wiretap charges. The defendant and his attorneys must use the contents in confidence, and disclosure to third parties, or use for purposes other than to prepare a defense against the wiretap charges, exceeds the bounds of the privilege. Given the narrowness of the privilege, both plaintiffs and defendants have an incentive to seek protective orders defining the permissible boundary of a defendant's use in each case.

■ While this privilege insulates O'Malley's disclosure to Weston, Hurd, and Weston, Hurd's subsequent internal use of the contents of the communication to prepare O'Malley's defense, it does not protect the defendants' disclosure of certain contents of the intercepted communications in the two motions for summary judgment, which became part of the public record when filed. The defense exception does not permit any public disclosure, thus requiring parties initially to file revelatory motions in camera, and does not justify use or disclosure for purposes that do not materially advance a party's defense to wiretap charges. The First Circuit has recognized an implied "adjudication exception" that permits disclosure of intercepted material to a court for admissibility determinations and to a court or jury for a resolution of illegality. *See Williams v. Poulos,* 11 F.3d 271, 286 (1st Cir.1993). An adjudication exception complements the defense exception, because a defendant's attorneys must have knowledge of the contents of

communications to promote their client's interest when the court rules on the admissibility of evidence related to the interception. *See ibid.*

Even if this case implicates the adjudication exception, neither an implied adjudication exception nor the defense exception justifies the public disclosure that occurred in the summary judgment motions filed by O'Malley and Weston, Hurd. Those motions occurred in a public filing. Further, they did not materially advance O'Malley's defense. (We note that, even if the disclosure would have aided O'Malley's defense, nothing prevented him from submitting the affidavit to the court in camera before making a public filing.) Because O'Malley countered the wiretap charges in *Master* and *Weinkammer* by denying any involvement in a wiretap conspiracy, the contents of the intercepted communications had minimal relevance to his motion for summary judgment.[6] The republication of the contents of the communication violated the plain language of Title III and Ohio's wiretap law, infringing on Nix's privacy interests as recognized by Congress and the Ohio legislature. This near-gratuitous disclosure, even if inadvertent, exceeds the scope of any implied exception to Title III and Ohio's law. Whatever the outer bounds of the adjudication and defense exceptions, they do not permit the public disclosure of the contents of an illegally intercepted communication where an in camera or sealed disclosure will not materially harm a party's defense.

### C. Attorney Immunity

■■■ We decline Weston, Hurd's invitation to immunize attorneys for certain violations of Title III and Ohio wiretap law. Weston, Hurd argues by analogy to the common-law privilege that protects attorneys who republish defamatory statements when defending their client. *See, e.g., Theiss v. Scherer*, 17 Ohio Misc. 172, 396 F.2d 646, 649 (6th Cir.1968) (interpreting Ohio law in a defamation case and stating that "[i]t is beyond argument that statements made in pleadings filed in a judicial proceeding come within the rule of absolute privilege"); *Surace v. Wuliger*, 25 Ohio St.3d 229, 495 N.E.2d 939, 942–43 (Ohio 1986) (establishing an absolute privilege protecting the republication of defamatory statements in any written pleading that has "some reasonable relation to the judicial proceeding in which it appears"). True, Weston, Hurd disclosed the contents of the intercepted communications in relation to a judicial proceeding—the firm filed the summary judgment motions in response to Nix's claims of wiretap violations. We do not believe, however, that any implied statutory immunity has a breadth equal to that of the common-law defamation privilege.

First, as with the adjudication and defense exceptions, this proposed immunity contravenes the plain language of federal and state wiretap statutes. *Cf., e.g., United States v. Wuliger*, 981 F.2d 1497, 1505 (6th Cir.1992) (declining to permit attorney to receive special jury instruction for Title III's "reason to know" standard, explaining, "[t]here is nothing in the Act which affords attorneys special treatment"), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994). This also casts doubt on the application of common-law defamation immunity to statutory wiretap

---

**6.** The disclosure also had minimal pertinence to his position as a city councilman. At oral argument, O'Malley's attorney raised for the first time a reference (admittedly cryptic) to "legislative immunity." We interpret this as a reference to the orders in *Weinkammer* and *Master*, which granted O'Malley's motions for summary judgment. In each case, the district court found that O'Malley did not engage in conspiracy when he met with his constituents to address their concerns over the Nix/Master housing development. Without deciding the validity of such a privilege as applied in those cases, we note that O'Malley acted in a private capacity when he filed his motions for summary judgment in *Master* and *Weinkammer*. Were we confronted with a properly presented claim of legislative privilege, we would pause before finding that it insulated O'Malley's disclosures. *Cf. Doe v. McMillan*, 412 U.S. 306, 319, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1972) (explaining that legislative immunity for defamatory publications turns on "the relation of the publication complained of to the duties entrusted to the officer") (citation omitted); *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 30–31 (1st Cir.1996) (distinguishing legislative disclosures from private republications); *Bigelow v. Brumley*, 138 Ohio St. 574, 37 N.E.2d 584, 591–92 (Ohio 1941) (finding Ohio's legislative immunity limited to instances where a defamatory publication is "pertinen[t] to the occasion of the privilege").

regulation. Second, as with the defense exception established above at pages 14–18, the disclosures in the summary judgment motions exceed the boundaries of any attorney immunity because the disclosures were tangential to O'Malley's defense.[7] *Cf. Scheib v. Grant,* 22 F.3d 149, 156 (7th Cir.) (contending that Illinois would interpret its wiretap statute to immunize attorneys, but limiting the immunity to disclosure in a manner "intimately associated with an ongoing judicial proceeding"), *cert. denied,* 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 280 (1994).

The Ohio legislature banned the disclosure of the contents of illegally intercepted communications, recognizing the damage to plaintiffs' privacy interests upon each republication. We agree with the *Wuliger* court that "[t]here is nothing in the Act which affords attorneys special treatment," 981 F.2d at 1505, and we hold that our recognition of a defense exception affords attorneys ample protection. Zealous defense of a client does not permit law-breaking.

### IV. Conclusion

Wiretapping is illegal, and so is the use or disclosure of the contents of an intercepted communication when a defendant knows or has reason to know that the interceptor obtained the communication illegally. The plaintiff met his burden of showing that sufficient evidence exists for a jury to find that, when O'Malley and Weston, Hurd disclosed certain contents of his recorded telephone calls, they had reason to know that the interception violated Ohio law. Because the defendants enjoyed no privilege to disclose the contents in public filings, we REVERSE the grant of summary judgment on plaintiff's first claim insofar as it disposed of plaintiff's contention that the disclosure in the summary judgment motions violated Ohio's wiretap law. We AFFIRM the grant of summary judgment as to the second and third claims, and REMAND the case to the district court for proceedings consistent with this opinion.

---

**7.** Any attorney immunity must have limits. For example, attorneys cannot claim immunity after posting the contents of a communication on the Internet in a scattershot effort to find other parties to taped conversations ("potential defense witnesses," perhaps).