Office of Disciplinary Counsel *v.* Pollock.

[Cite as *Disciplinary Counsel v. Pollock,*
100 Ohio St.3d 280, 2003-Ohio-5752.]

(No. 2003-0398—Submitted June 24, 2003—Decided November 12, 2003.)

**Per Curiam.**

{¶ 1} Respondent, Harold Pollock of Cleveland, Ohio, Attorney Registration No. 0009271, was admitted to the practice of law in 1976. In a complaint filed April 8, 2002, relator, Office of Disciplinary Counsel, charged respondent with professional misconduct committed while respondent pursued at least 20 lawsuits on behalf of several clients embroiled in disputes stemming mainly from their plans to develop property. A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") heard the cause and made findings of fact, conclusions of law, and a recommendation. The panel's findings of fact as to the underlying misconduct are based principally on the parties' stipulations.

{¶ 2} In December 1993, respondent agreed to represent Dr. John Master, an elderly, retired physician, and John H. Nix, who had befriended Master through his acquaintance with Master's housekeeper. Master, who lived in an established Cleveland neighborhood, had no children and had lost his wife, Dr. Anne Master, in 1991.[1] By the end of 1993, Nix had moved into Master's home and had formed a partnership between them and the housekeeper, to which Master had conveyed all of his real property, which included eight parcels adjacent to Master's home that the partnership planned to develop.

{¶ 3} Respondent had previously performed legal work for Nix, and Nix sought respondent's services again after Patrick J. O'Malley, who served on Cleveland City Council representing the ward in which the partnership property was

---

1. Dr. Anne Master was survived only by her husband, her sister, and a grandniece.

located, declined Nix's request for support of a tax-abatement plan to aid the development. Nix also knew that some neighboring residents opposed the project.

{¶ 4} Apparently some of these residents had also consulted O'Malley to voice their concerns about the development, including the possibility that Master was incompetent and being exploited by Nix. Respondent claims that O'Malley asked the Cleveland police to investigate Master's household, a course of action police abandoned after Master appeared to be in sound mental health. A probate court investigator also found no reason to pursue proceedings for Master's protection.

{¶ 5} On or about December 12, 1993, various residents met in the home of Jack and Carole Sword, who lived across the street from the Master residence. O'Malley also attended the residents' meeting, to which neither Master nor Nix was invited. Events before and during this meeting would later be the subject of considerable controversy and, under respondent's direction, much litigation.

{¶ 6} Also in late 1993, Nix apparently asked the FBI to investigate the disappearance of bearer bonds that had belonged to Master's wife. The bearer bonds had disappeared while attorney Paul P. Chalko, who would later oversee the administration of the wife's estate, represented the couple. Respondent's efforts to recover the missing bearer bonds also generated much litigation.

{¶ 7} In January 1994, respondent filed a lawsuit against the Swords on behalf of Master and Nix, asserting claims for defamation, invasion of privacy, and intentional infliction of emotional distress. The complaint included the allegations that (1) the Swords had informed O'Malley that Nix was attempting to defraud Master of his assets and (2) at the December 12, 1993 meeting, the Swords had told attendees that Master was incompetent and that Nix was defrauding him. Respondent deposed 13 people, including the Swords and other residents of the neighborhood, during discovery. All failed to confirm the allegations of defamation, and the trial court granted summary judgment for the Swords. The court of appeals affirmed the trial court, notwithstanding respondent's contention that issues of credibility requiring a trial remained. See *Master v. Sword* (Nov. 9, 1995), Cuyahoga App. No. 68297, 1995 WL 662108.

{¶ 8} In early January 1994, Dr. Anne Master's grandniece, Cleveland police officer Sue Sazima, contacted Chalko and asked him to apply in probate court for her appointment as Master's guardian. Represented by another attorney, Master filed an application to have Nix appointed as his conservator. Sazima ultimately withdrew her request for guardianship, and the court appointed Nix as conservator.

{¶ 9} Then, in February and March 1994, one or more individuals intercepted and taped telephone conversations made from or received by the Master/Nix residence. The interceptor(s) acted without a warrant and without the consent of

the parties to the conversations. In late March 1994, Nix obtained four cassette tapes containing recordings of these conversations. The interceptions resulted in a series of lawsuits.

{¶ 10} In April 1994, respondent filed a lawsuit in federal district court on behalf of Master, Nix, and others whose communications were intercepted ("the first wiretapping case"). The complaint alleged that the Swords, O'Malley, and Sazima, among others, engaged in illegal wiretapping, conspiracy to invade privacy, conspiracy to conceal wiretapping, and intentional infliction of emotional distress in an effort to block the partnership's development plan.

{¶ 11} In June 1994, respondent filed a lawsuit for Master and Nix against Chalko, claiming that he had committed malpractice by negligently failing to pursue the recovery of the bearer bonds ("the first malpractice suit"). Respondent later amended the complaint to also name Sazima, alleging that she (1) had conspired with Chalko to have herself appointed Master's guardian in an effort to gain control over his assets and (2) had tortiously interfered with the attorney-client relationship between Master and his former attorney. The court denied Sazima's motion to dismiss but also dismissed the claim concerning recovery of the bearer bonds, finding the claim improper in a malpractice action. At trial,[2] Sazima invoked her Fifth Amendment privilege against self-incrimination during cross-examination, and the court directed the jury's verdict in her favor. The jury returned a verdict against Chalko for $300 in compensatory and $30,000 in punitive damages.

{¶ 12} Respondent did not appeal the directed verdict against Sazima, and years later, the verdict against Chalko was reversed. See *Master v. Chalko* (June 5, 1997), Cuyahoga App. No. 70527, 1997 WL 298260. Sazima, however, filed a motion under R.C. 2323.51 for attorney fees as sanctions for frivolous conduct. Respondent opposed the motion, but further proceedings were apparently stayed pending Chalko's appeal.

{¶ 13} In November 1994, after filing lawsuits in state and federal courts against the Swords, O'Malley, and Sazima, respondent filed on behalf of Nix and Master a complaint for declaratory judgment against these individuals and their insurance carriers: Nationwide Mutual Insurance Company, Allstate Insurance Company, and State Farm Insurance Company. Respondent asked the trial court to declare that the defendants' insurance companies had no duty to defend these insureds under their homeowner's policies and cited precedent from which he argued that his clients had standing, even as third parties, to pursue the

---

2. Master died on or about October 29, 1995, before trial in the first malpractice suit. Nix was appointed executor of Master's estate and successor administrator of the estate of Dr. Anne Masters. At various times during this case and subsequent proceedings, respondent also represented Nix in his representative capacities.

declaratory judgment. The trial court held, and the court of appeals affirmed, that respondent's clients lacked such standing, that there could be no discovery of the insurance companies' files prior to a ruling on a motion to dismiss, and that an insurance company must provide a defense if the claims are potentially or arguably within the policy coverage. See *Master v. O'Malley* (Apr. 4, 1996), Cuyahoga App. No. 68895, 1996 WL 157340.

{¶ 14} In April 1995, respondent filed a lawsuit in federal court on behalf of Master's accountant, alleging that the Swords, O'Malley, and Sazima, among others, conspired to wiretap Nix's telephone and to use the information gained from the interception to block the partnership's proposed housing development ("the second wiretapping case"). This suit alleged not only that the defendants had intercepted the telephone communications, but also that they had illegally used and disclosed the contents of the communications.

{¶ 15} Thereafter, O'Malley retained the law firm of Weston Hurd, Fallon, Paisley & Howley, L.L.P. ("Weston Hurd"), to defend him against the allegations in the two wiretapping cases. O'Malley denied involvement in any conspiracy or wiretapping but admitted that he had heard portions of a recording that probably contained the intercepted communications. In November 1995, Weston Hurd filed in the wiretapping cases affidavits to support motions for summary judgment. O'Malley purportedly disclosed in these affidavits certain contents of the intercepted communications. For the purpose of the disciplinary proceedings, relator and respondent stipulated that these disclosures, if made with knowledge or reason to believe that said tapes had been illegally made, violated Ohio and federal law.

{¶ 16} In December 1995, respondent initiated another lawsuit against Chalko on behalf of Master and Nix. This action ("the second malpractice suit") claimed that Chalko should have attempted to recover the missing bearer bonds. The trial court granted summary judgment against the plaintiffs in the second malpractice case for the reason, among others, that Chalko had not been asked to recover the bonds and, therefore, owed no such duty to Master. The trial court's judgment was affirmed on appeal. See *Nix v. Chalko* (Feb. 19, 1998), Cuyahoga App. No. 72023, 1998 WL 72495.

{¶ 17} On December 27, 1995, soon after he filed the second malpractice case, respondent filed yet another suit on Nix's behalf, this one against O'Malley and Weston Hurd. The suit, which was later removed to federal district court on the basis of a RICO claim, contained three counts: (1) the defendants had violated Ohio and federal wiretap statutes by using and disclosing the contents of the intercepted conversations; (2) the defendants had conspired to aid and abet others in the concealment of the wiretapping and had withheld unprivileged statements about the wiretapping to avoid civil and criminal liability; and (3) the

law firm had committed "legal malpractice," notwithstanding that the law firm had never represented the plaintiff.[3]

{¶ 18} The district court granted the defendants' motions for summary judgment on all counts. On appeal, however, the Sixth Circuit Court of Appeals affirmed in part, reversed in part, and remanded. In reversing, the court of appeals found that the first count presented a genuine issue of material fact. See *Nix v. O'Malley* (C.A.6, 1998), 160 F.3d 343.

{¶ 19} Respondent also attempted to instigate various criminal or disciplinary proceedings. In May 1994, he sent a letter asking the Cleveland Police Department to internally investigate allegations that Sazima had illegally accessed a police computer. The police department conducted an investigation and presented the results to the Cleveland City Prosecutor. In January 1995, the city prosecutor concluded that there was not probable cause to believe that Sazima had committed a crime.

{¶ 20} In March 1995, also at respondent's urging, Cleveland police investigated allegations that Sazima had participated in illegal wiretapping of respondent's clients. And in June 1995, respondent wrote a letter to the Cuyahoga County Prosecutor asking for felony indictments against various individuals whom he alleged to be responsible for the wiretapping of his clients' telephone conversations, the illegal use and/or disclosure of the tapes, and/or a cover-up of these crimes. Respondent accused Sazima, other members of the police force, Chalko, O'Malley, and neighborhood residents, including the Swords, among others. No indictments resulted from the allegations in respondent's letter.

{¶ 21} Moreover, in May 1995, respondent, acting on behalf of Master, Nix, and Master's probate attorney, accountant, and former housekeeper, submitted a public records request for documents compiled during the police department's investigation of Sazima. And in June 1995, acting on behalf of the same clients, respondent filed an action in this court seeking a writ of mandamus to compel the city prosecutor to investigate the alleged misconduct of Sazima and other city employees and to compel the police department and the city of Cleveland to allow the inspection and copying of the records requested in the May 1995 public records request. The complaint further requested a writ ordering appointment of a special prosecutor to "investigate and prosecute the wiretappers, and those who have concealed the wiretapping."

{¶ 22} In *State ex rel. Master v. Cleveland* (1996), 75 Ohio St.3d 23, 661 N.E.2d 180, we held that Master and Nix were not entitled to the requested writ.

---

3. The stipulations indicate that respondent filed a similar complaint against the attorneys who had represented the Swords and that that case was also removed to federal court on the basis of a RICO claim.

However, we ordered the city to submit the subject records for review under seal to permit us to determine the applicability of the uncharged-suspects exception of Ohio's Public Records Act. Id.

{¶ 23} Thereafter, in *State ex rel. Master v. Cleveland* (1996), 76 Ohio St.3d 340, 342, 667 N.E.2d 974, we examined the records submitted by the city and, for the limited purpose of that case, observed that "some person or persons purposely intercepted and recorded * * * Nix and Master's cordless telephone conversations through the use of some interception device. The foregoing constitutes a violation of R.C. 2933.52(A)." We concluded, however, that the records were exempt from disclosure under the work-product, uncharged-suspect, and other-law provisions of Ohio's public records laws. We also concluded that "[t]he records do not indicate any policy cover-up or fictitious investigation, as relators have alleged. Instead, the sealed investigatory file indicates a thorough investigation by law enforcement officials." Id. at 343–344, 667 N.E.2d 974.

{¶ 24} On December 19, 1995, respondent filed still another suit for Nix, this time against Nancy Schuster and Schuster & Simmons Co., L.P.A., Sazima's attorneys in the first malpractice case. This complaint alleged, among other claims, that Schuster had violated state and federal wiretapping laws during that proceeding. As to the disposition of this case, the stipulations before the panel indicate only that "[t]he case was removed to federal court, remanded to the state court, and refiled on June 24, 1996 [with a different case number]. The trial court denied two dispositive motions as to one cause of action filed by Schuster and then, on the morning of trial, granted a defense motion in limine which resulted in a voluntary dismissal without prejudice by respondent."

{¶ 25} In August 1997, again for Nix, respondent filed a second public records request asking for voluminous materials pertaining to the wiretapping and to O'Malley that were alleged to be in the city of Cleveland's possession. After the city responded to the request, respondent filed another writ of mandamus in this court. Concluding that the requests for records were largely meritless, we noted that the requests were moot insofar as they requested access to records already provided, that some of the requested records were subject to the attorney-client privilege, and that the other records were exempt from disclosure as trial-preparation records. *State ex rel. Nix v. Cleveland* (1998), 83 Ohio St.3d 379, 700 N.E.2d 12.

{¶ 26} In December 1998, respondent filed a lawsuit on Nix's behalf against O'Malley, Weston Hurd, and Nationwide Mutual Insurance Company and its counsel. This complaint asserted claims of civil conspiracy to conceal criminal conduct, conspiracy to defraud Nix, a state RICO claim, and legal malpractice as to one of the insurance company's attorneys. In particular, the lawsuit alleged that newly discovered evidence revealed that O'Malley had made false statements

in his affidavits and prior statements; that O'Malley was involved in the wiretapping; and that Nationwide and its counsel had assisted O'Malley and Weston Hurd in concealing evidence of O'Malley's involvement in the wiretapping. The trial court's decision to grant summary judgment in favor of the defendants in this case was also affirmed on appeal. *Nix v. Nationwide Mut. Ins. Co.* (Mar. 27, 2000), Stark App. No. 1999CA00176.

{¶ 27} Then, on February 3, 1999, after a long delay and a series of hearings commencing on July 6, 1998, the trial court granted Sazima's motion for sanctions in the amount of $78,504.71. According to the trial court's decision, the amount represented Sazima's legal fees incurred in the first malpractice case and in prosecuting her frivolous-conduct action. The trial court held that respondent, respondent's law practice, Nix in his individual capacity, Master's estate, and Nix as executor were jointly and severally responsible for paying Sazima's award.

{¶ 28} Before Sazima was granted attorney fees, respondent sued the trial court itself. In the Eighth District Court of Appeals, respondent requested a writ of mandamus and/or prohibition to prevent the judge from hearing the motion for sanctions. Rejecting respondent's request, the court of appeals held that respondent and Nix had failed to state a claim upon which relief could be granted. See *State ex rel. Nix v. Curran* (Sept. 23, 1998), Cuyahoga App. No. 75261, 1998 WL 685384.

{¶ 29} While the trial court was considering Sazima's motion for sanctions, respondent filed an affidavit of bias and prejudice against the trial judge. This court rejected respondent's allegations of bias and declined any disqualification. *Master v. Chalko* (Oct. 31, 1998), Supreme Court of Ohio No. 98–AP–125.

{¶ 30} Undeterred, respondent and Nix appealed from the ordered sanctions and determination that they had violated R.C. 2323.51. The court of appeals affirmed, concluding that respondent, in particular, had exhibited "extreme bad faith," had "improperly directly contacted [Sazima's] insurers in an attempt to deprive her of coverage" to try to intimidate and harass her, had "pursued litigation against [Sazima] in an abusive and vexatious manner," and had gone "far beyond" zealous advocacy. *Master v. Chalko* (May 11, 2000), Cuyahoga App. No. 75973, 2000 WL 573200. We dismissed sua sponte respondent's request for discretionary review. *Master v. Chalko* (2000), 90 Ohio St.3d 1428, 736 N.E.2d 25.

{¶ 31} The panel incorporated information from the following stipulations as part of its findings:

{¶ 32} "52. During the course of litigation that respondent filed on behalf of [Master and Nix], respondent telephoned and/or wrote to insurance companies in order to persuade potential insurers against affording Sazima, O'Malley, and others a defense and/or indemnity protection. Respondent also asked that

Sazima be forced to repay her insurers for any legal sums expended in her defense.

{¶ 33} "53. During the course of the litigation that respondent filed on behalf of [Master and Nix], respondent took numerous depositions of parties and witnesses. At the depositions, respondent asked questions designed to elicit answers constituting inadmissible evidence. As the lawsuits progressed, respondent's conduct made it necessary for the parties to conduct depositions in the presence of a magistrate or judge.

{¶ 34} "54. On more than one occasion, respondent asked Cuyahoga County and city of Cleveland prosecutors to file criminal charges against opposing counsel. * * *

{¶ 35} "55. Respondent accused Sazima of being a corrupt police officer in a written communication to the Civil Service Commission.

{¶ 36} "56. After he sued Attorney Nancy Schuster, respondent made several attempts to deny her malpractice coverage.

{¶ 37} "57. [Respondent filed] approximately 20 state and federal lawsuits instituted * * * against various parties, including Sazima and arising out of Nix's relationship with [Master].

{¶ 38} "58. Sazima, O'Malley, Sword and others were forced to expend inordinate time, money, and effort to defend against the allegations.

{¶ 39} "59. No one has been charged with a crime in connection with the wiretapping allegations set forth by respondent on behalf of Nix, [Master], and others.

{¶ 40} "60. The FBI completed its investigation * * * in connection with the bearer bonds that originally belonged to [Master's wife]. Evidence compiled by the FBI was presented to an Assistant United States Attorney. [No one was] charged with a crime in connection with the bearer bonds. [The FBI was able to recover approximately half of the bearer bonds at issue.]

{¶ 41} "61. In or about July 2000, all of the then-pending lawsuits filed by respondent on behalf of Nix and others as well as those filed by Nix, pro se, were dismissed under the terms of a global settlement agreement. Under the terms of the global settlement agreement, approximately 12 defendants including but not limited to Weston, Hurd; O'Malley; * * * and Nationwide Mutual Insurance Co., agreed to pay $61,000 to Sazima to satisfy respondent's and, Nix's sanction award and to relinquish all claims they may have against inter alia respondent and Nix arising out of the wiretap litigation. In exchange, respondent agreed to dismiss with prejudice all pending claims against the defendants."

{¶ 42} The panel found that respondent's conduct at issue in these proceedings violated DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of

justice), 1–102(A)(6) (engaging in conduct that adversely reflects on an attorney's fitness to practice law), 7–102(A)(1) (taking legal action during representation that obviously serves to harass or maliciously injure another), 7–102(A)(2) (advancing a claim or defense that the attorney cannot in good faith assert is warranted under existing law, or the extension, modification, or reversal of existing law), 7–106(C)(1) (while before a tribunal, stating or alluding to a matter that is not reasonably considered relevant or supportable by admissible evidence), and 7–106(C)(2) (while before a tribunal, asking a question that is not reasonably considered relevant and is designed to degrade another).

{¶ 43} In recommending a sanction for this misconduct, the panel observed that respondent has been practicing law for 27 years without a previous disciplinary infraction. The panel also considered testimony that respondent has an established reputation for dedication and competence, particularly in real estate law. According to witnesses, respondent is considered by many in the legal community to be an extremely zealous and passionate advocate, having a history of representing clients in seemingly unpopular causes or where the clients' success appeared unlikely. This dedication was graphically manifested by respondent's having personally expended at least $225,000 of the $350,000 needed to fund the litigation underlying the charged misconduct. However, because respondent had "crossed the line" between zealous, but principled, advocacy and the zealousness that "comes from personalizing the litigation," the panel recommended that respondent be suspended from the practice of law for one-year, with six months of this period stayed. The board adopted the panel's findings of misconduct and recommendation.

{¶ 44} In objecting to the board's report, respondent concedes that he violated DR 1–102(A)(5), 7–102(A)(1), and 7–106(C)(2), but insists that he did not violate DR 1–102(A)(6), 7–102(A)(2), and 7–106(C)(1).

{¶ 45} As to the violation of DR 7–102(A)(2), we decline to find specifically unethical what respondent insists is creative precedent and argument to advance his clients' causes. It is true that various courts, including this one, have found his claims meritless and, at times, frustratingly repetitious. However, those findings do not necessarily mean that the arguments are so far-fetched that professional discipline is in order. Attorneys must be given rein to experiment in groundbreaking legal pursuits, and here, respondent researched and supplied precedent (however tenuous) for his controversial claims. We will not foreclose the assertion of novel legal theories through the disciplinary process unless they are absolutely specious. The alleged violation of DR 7–102(A)(2), therefore, is dismissed.

{¶ 46} However, we agree that respondent "crossed the line" and thereby violated DR 1–102(A)(5), 1–102(A)(6), and 7–102(A)(1). Respondent's representa-

tion in the underlying cases became a personal crusade no longer driven by his clients' interests. Even respondent realizes now that he lost his objectivity. Thus, despite respondent's explanations for the claims and arguments he advanced throughout this ordeal and his assurance that he only sought justice for his clients, we view respondent's "zeal" as blind determination to ruin those he seemed to consider his clients' oppressors. Drawing the same conclusion, the Eighth District Court of Appeals declared respondent "an obnoxious litigator bent on abusing the courts to further an illegitimate agenda." *Master v. Chalko* (May 11, 2000), Cuyahoga App. No. 75973, 2000 WL 573200. That court provided these samples of his work when discussing his treatment of Sazima:

{¶ 47} "Despite the fact that Mr. Nix and his attorneys have filed in excess of 20 lawsuits against an array of defendants arising out of the same series of transactions, and have accused literally dozens of people, including prominent public officials, of being involved in intricate and high-level conspiracies to loot the modest assets of the respective Masters' estates, they have repeatedly been stymied in their efforts to obtain judgments on these claims as they inevitably prove to be meritless after the courts are able to sift through the sensational allegations and examine the evidence. See *Master v. Sword* (Nov. 9, 1995), Cuyahoga App. No. 68297; *Master v. O'Malley* (Apr. 4, 1996), Cuyahoga App. No. 68895; *Master v. Chalko* (June 5, 1997), Cuyahoga App. No. 70527; *Nix v. Chalko* (Feb. 19, 1998), Cuyahoga App. No. 72023; *State v. Curran* (Sept. 23, 1998), Cuyahoga App. No. 75261.

{¶ 48} "The record is replete with evidence of malicious intent on the part of the appellants [respondent and Nix] during their pursuit of the instant litigation against the appellee [Sazima] so as to justify the imposition of sanctions under R.C. 2323.51. In a transparent effort to professionally embarrass the appellee, a Cleveland police officer, the appellants attempted to depose representatives of the Cleveland Police Department, the Civil Service Commission, and the Federal Bureau of Investigation. Additionally, the appellants sought to depose [several high-ranking Cleveland officials, including the mayor]. There was not a shred of evidence presented at the sanctions hearing by the appellants which tended to indicate that any of these officials possessed any information that was in any manner relevant to the claims brought against the appellee. The appellants, in furtherance of their character assassination objectives, chose to write a letter to the Cuyahoga County Prosecutor stating that the appellee was a 'dirty cop' and asking that she be criminally investigated. The appellants even filed a motion with the trial court asking that there be a 'referral' to the county prosecutor for the purposes of a criminal investigation. Once again, the appellants failed, throughout the entire course of this litigation, to either substantiate these charges or to demonstrate their relevance to the proceedings." *Master v. Chalko* (May 11, 2000), Cuyahoga App. No. 75973, 2000 WL 573200.

{¶ 49} We also agree that respondent violated the two remaining Disciplinary Rules addressed by the panel, DR 7–106(C)(1) and (2). Respondent does not contest that he at times posed irrelevant and disparaging questions, contrary to DR 7–106(C)(2). Moreover, the parties stipulated, in effect, that at some point while representing Master and Nix, respondent so persistently asked for inadmissible information that further depositions required court supervision. Furthermore, we have before for us the transcripts from the hearing on Sazima's motion for sanctions, and they contain numerous examples of respondent's inappropriate inquiries.

{¶ 50} Respondent also argues that an actual suspension of any period is too severe in light of the mitigating factors and absence of many aggravating concerns. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. He also urges us to temper our disposition for the reason that his over-the-top zeal in the underlying proceedings was provoked by unique circumstances unlikely to recur. See *Disciplinary Counsel v. Miller*, 97 Ohio St.3d 500, 2002-Ohio-6729, 780 N.E.2d 586, ¶ 14. In *Disciplinary Counsel v. Donnell* (1997), 79 Ohio St.3d 501, 684 N.E.2d 36, however, we suspended an attorney's license for six months because he exceeded the bounds of zealous advocacy while representing himself in a custody dispute. Legal wrangling of the proportion in which respondent engaged requires a similar disciplinary sanction for the public's protection.

{¶ 51} Accordingly, a suspension of one year, with six months stayed, is appropriate. Respondent is therefore suspended from the practice of law in Ohio for one year, but six months of this sanction are stayed on the condition that he commit no further misconduct during that period. If respondent violates the condition of this stay, the stay will be lifted and respondent will serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator.

Zukerman, Daiker & Lear Co., L.P.A., Larry W. Zukerman and S. Michael Lear, for respondent.