OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of Ohio
are being transmitted electronically beginning May 27, 1992,
pursuant to a pilot project implemented by Chief Justice Thomas
J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


M.J. DiCorpo, Inc., d.b.a. Gupta, DiCorpo & Dykman, et al.,
Appellees and Cross-Appellants, v. Sweeney et al., Appellants
and Cross-Appellees.
     [Cite as M.J. DiCorpo, Inc. v. Sweeney (1994),     Ohio
St.3d    .]
                              ---
An affidavit, statement or other information provided to a
     prosecuting attorney, reporting the actual or possible
     commission of a crime, is part of a judicial proceeding.
     The informant is entitled to an absolute privilege against
     civil liability for statements made which bear some
     reasonable relation to the activity reported.
                              ---
     (No. 93-186 -- Submitted April 19, 1994 -- Decided June 29,
1994.)
     Appeal and Cross-Appeal from the Court of Appeals for
Cuyahoga County, No. 61017.
     Attorney Robert E. Sweeney, appellant and cross-appellee,
is the sole shareholder of appellant and cross-appellee Robert
E. Sweeney & Associates Co., L.P.A. ("RESCO"), an Ohio legal
professional association.  Michael J. DiCorpo, appellee and
cross-appellant, is the sole owner of appellee and
cross-appellant M.J. DiCorpo, Inc., d.b.a. Gupta, DiCorpo &
Dykman ("Gupta-DiCorpo"), a professional consulting firm.  In
January 1988, RESCO hired Gupta-DiCorpo to serve as consultant
to the law firm.  From January 1988 to November 1989,
Gupta-DiCorpo and Michael J. DiCorpo performed services for
RESCO at agreed-upon hourly rates.  Gupta-DiCorpo submitted
monthly invoices to RESCO for the services performed by the
consulting firm.  All services were billed at the applicable
hourly rate.  It appears RESCO paid the monthly billing
invoices through September 1989.
     During the summer of 1989, RESCO and another Cleveland-area
law firm, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli
Co., L.P.A. ("CCSL&G"), jointly retained Gupta-DiCorpo to
negotiate and arrange a merger of RESCO and CCSL&G.  In October
1989, Michael J. DiCorpo, acting on behalf of Gupta-DiCorpo,
prepared a one and one-half page "letter of intent" (and,

later, a one page addendum) setting forth some of the basic terms and conditions of the proposed merger.  On or before November 1, 1989, the letter of intent and addendum thereto (with a few minor modifications) were signed and approved by Robert E. Sweeney and Michael L. Climaco on behalf of RESCO and CCSL&G, respectively.  The letter of intent was dated November 1, 1989, and read, in part:

"This is a basic letter of intent to merge the practice of Robert E. Sweeney & Associates Co., L.P.A. (RESCO) into the practice of Climaco, Climaco, Seminatore, Lefkowitz & Garafoli [sic Garofoli] (CCSL&G).  The following items are the basic terms and conditions:

"1)  All necessary employees as determined by Robert E. Sweeney (RES), John R. Climaco (JRC) and Michael J. DiCorpo will be given a six month employment contract with CCSL&G.

"2)  RES will be given a five year employment contract at $250,000.00 per year plus expenses.  RES can retire any time after three years and forego the remainder of the contract. This contract can be renewed by mutual agreement of the parties.

"3)  [RES] will sell his practice and cases to CCSL&G for $13,000,000.00 payable at $2,000,000.00 per year for the first five years and $1,000,000.00 per year for the next three years.  * * *

"4) * * * The firms will look into the possible combination of the pension plans.

"* * *

"7)  If net fees collected fall below $5,500,000.00 during either of the first 2 years, or below $5,000,000.00 during either of the second 2 years, or below $4,000,000.00 during the fifth year, or below $3,000,000.00 during any of the last 3 years, then the buyout in item 3) above will be reduced by the percentage which the net fees are below the stated numbers in this item 7).

"8)  This deal must be completed by 11/1/89 with a contemplated move to the Halle building on or before 2/1/90. CCSL&G will pay all relocation costs.

"This letter is meant as an agreement to principles and will be followed by a definitive agreement within 15 days of signing."1  (Emphasis added.)

Beneath the signatures in the letter of intent is a paragraph that reads:  "The consulting firm of Gupta, Dicorpo [sic DiCorpo] & Dykman will receive a fee of 2% upon completion of this deal, one-half payable by each firm."  (Emphasis added.)

Apparently, within fifteen days of the signing of the letter of intent, a "definitive agreement" to combine the law practices was submitted by CCSL&G to Robert E. Sweeney for his approval and acceptance.  However, the proposed definitive agreement differed dramatically from the letter of intent.  The definitive agreement exceeded forty pages in length, addressed numerous matters not contemplated in the letter of intent, sought to impose significant burdens and obligations upon Robert E. Sweeney, and sought to limit Sweeney's power and control in the proposed combined law practice.  The definitive agreement, like the letter of intent, contemplated a five-year employment contract for Robert E. Sweeney at $250,000 per year, and contained an eight-year schedule of "target net fee amounts" to be used in determining the compensation (if any)

Sweeney was to be paid in connection with the merger.  Sweeney refused to sign the definitive agreement and, consequently, RESCO and CCSL&G never merged.

In December 1989, Gupta-DiCorpo and Michael J. DiCorpo (collectively "appellees") filed a complaint in the Court of Common Pleas of Cuyahoga County against RESCO and Robert E. Sweeney (collectively "appellants"), RESCO's business manager and three members of the RESCO law firm.  In the complaint, appellees alleged that on August 23, 1989, Gupta-DiCorpo entered into an oral "Compensation Agreement" with RESCO and CCSL&G.  Specifically, appellees alleged that RESCO, CCSL&G and Gupta-DiCorpo had verbally agreed that compensation for Gupta-DiCorpo's services in connection with the proposed merger would amount to two percent of the "agreed upon merger price," with each firm (RESCO and CCSL&G) obligated to pay one-half of the commission.  Appellees further alleged that the November 1, 1989 letter of intent "confirmed, documented, and set forth the Compensation Agreement" between Gupta-DiCorpo, RESCO and CCSL&G.  Appellees claimed that the letter of intent constituted a binding and enforceable "[C]ontract of Merger," that Sweeney had reneged on the merger, and that, therefore, appellants were obligated to pay appellees two percent of the amount Sweeney would have been entitled to receive had the merger occurred.

In the complaint, appellees sought recovery against appellants in the amount of $285,000 for breach of the alleged oral "Compensation Agreement" -- i.e., two percent of the proposed $14.25 million Sweeney was to receive for the merger under items 2 and 3 of the letter of intent.  Appellees also sought recovery against appellants in the amount of $285,000 for unjust enrichment.  All remaining claims in the complaint were directed against other named defendants and are not at issue in this appeal.

Michael J. DiCorpo was deposed on July 24, 1990.  In his deposition, DiCorpo testified concerning the terms of the oral "Compensation Agreement":

"Q  On August 23, [1989,] you came back and met with Mr. Sweeney?

"A  Yes.

"Q  Was that alone?

"A  Yes.

"Q  What transpired on August 23?

"A  I explained to him [Sweeney] we [Gupta-DiCorpo] would be doing the deal on a two-percent basis, two percent of whatever I got for him on the deal against our hourly fees, and that I had discussed that with * * * [John R. Climaco of CCSL&G], and he had agreed to that.

"* * *

"Q  You have used the phrase, two percent against our hourly rate, and it would be based upon, I believe you said, 'whatever I got for him.'

"A  Yes.

"Q  Was there any further discussion as to what was meant by 'whatever I got for him'?

"A  No.

"Q  What was your understanding as to what was meant by your comment, 'whatever I got for him'?

"A  That was a purchase deal.  So, it was whatever Mr. Sweeney was going to get paid to purchase his practice, because he was the sole owner.

"Q  Did you explain that to Mr. Sweeney at that time?

"A  Yes.

"Q  What did you explain to him?

"A  I explained to him the same thing that I just told you I explained to Mr. Climaco:  That, because we were currently working for both clients, when and if the merger did go through, we would be losing one of our clients, and we would like to do it on two percent of what we get for you, against our hourly rate.

"Q  Well, that is what I am asking you.  When you say 'two percent of whatever I get for you,' was the phrase, 'whatever I get for you,' defined in terms of an employment contract or in terms of lump sum payments, or how this would be calculated over time?

"A  No.  I had no idea at that time of what the deal was going to be.

"Q  So, as far as you can recall, you left it with: 'Whatever I can get for you'?

"A  That is correct."  (Emphasis added.)

DiCorpo testified further that he had billed RESCO and CCSL&G at his customary hourly rate for all services performed in connection with the proposed merger to secure payment for his services in the event that negotiations between RESCO and CCSL&G did not result in a merger.

During the pendency of the case, the trial court granted a motion by appellees for permission to file a supplemental complaint against appellants.  The events which gave rise to the filing of the supplemental complaint concerned an affidavit that was sent by Robert E. Sweeney to the Cuyahoga County Prosecutor in February 1990.  In the affidavit, Sweeney accused Michael V. Kelley, a former associate of RESCO, of embezzling funds from a joint account maintained by RESCO and CCSL&G (the "Climaco-Sweeney Trust Account").  Sweeney averred that between January 1, 1989 and November 15, 1989, Kelley, "abetted and aided by one Michael DiCorpo," had "carried on a very close and vigorous effort" to persuade Sweeney to merge RESCO with CCSL&G, "as it was obvious to Mr. Kelley that the only way he [Kelley] could fold in the taking of the money from the Climaco-Sweeney Trust Account was to accomplish a merger between the respective firms."  A copy of the affidavit was obtained by a Cleveland newspaper which, on February 11, 1990, published an article detailing the allegations made against Kelley in the affidavit.

In the supplemental complaint, appellees alleged that the statements in Sweeney's affidavit concerning them were false, defamatory and libelous.  Appellees sought recovery against appellants for defamation and negligent or intentional infliction of emotional distress.  Appellees also sought recovery against appellants for invasion of privacy for allegedly publishing (or causing to be published) false information about appellees that placed them in a "false light before the public."

Appellants filed motions for summary judgment on all claims asserted against them in the original and supplemental

complaints.  The trial court granted appellants' motions and dismissed the entire case.  The trial court held that the two-percent consulting fee agreement was unenforceable as a matter of law since the amount to which the percentage was to be applied was uncertain, speculative and incapable of determination.  With respect to the claims of unjust enrichment, the trial court concluded that appellees were not entitled to a $285,000 windfall commission on a merger that never occurred.2  The trial court held that none of the claims set forth in the supplemental complaint was actionable, stating that "any citizen is entitled to file an affidavit with the County Prosecutor under a qualified privilege which can be defeated only by a showing of malice."  The trial court found no evidence of malice and found further that the statements in Sweeney's affidavit were not defamatory to appellees.  Additionally, with regard to appellees' claim for invasion of privacy, the trial court held that "Ohio does not recognize a claim for invasion of privacy under a false light theory."

On appeal, the court of appeals affirmed that portion of the trial court's judgment granting summary judgment on the claims set forth in the supplemental complaint, holding that the alleged defamatory statements in the affidavit submitted to the county prosecutor were protected by an absolute rather than a qualified privilege.  However, by a divided vote, the court of appeals reversed that portion of the trial court's judgment granting summary judgment in favor of appellants on the claims for breach of the oral "Compensation Agreement."  The court of appeals' majority held that summary judgment on these claims was improper since questions of fact remained unresolved concerning the amount to which the two-percent commission was to be applied.

The cause is now before this court pursuant to the allowance of a motion and a cross-motion to certify the record.

Goodman, Weiss & Freedman, Robert A. Goodman and Steven J. Miller, for appellees and cross-appellants.
Gallagher, Sharp, Fulton & Norman, Burt Fulton and Jay Clinton Rice, for appellants and cross-appellees.

Douglas, J.    Appellants appeal, urging that the alleged oral "Compensation Agreement" is unenforceable as a matter of law and that, therefore, the court of appeals erred in finding that summary judgment was improper on appellees' claims for breach of contract.  Appellees cross-appeal from the judgment of the court of appeals which affirmed the trial court's decision granting summary judgment on the claims set forth in the supplemental complaint.  Given the procedural posture of this case, all relevant evidence must be viewed in a light most favorable to appellees who opposed the motions for summary judgment at the trial court level.  See Civ.R. 56(C).

I
Appellants' Appeal

The "Compensation Agreement" which formed the basis for appellees' original complaint consisted of an alleged verbal agreement that appellees' fee for arranging the proposed merger would be two percent of the ultimately agreed upon merger price, with RESCO and CCSL&G each obligated to pay one-half of

that commission.  The letter of intent executed by representatives of RESCO and CCSL&G memorialized that oral agreement and stated that appellees were entitled to a fee of two percent "upon completion of this deal."  In his deposition, Michael J. DiCorpo testified that the "Compensation Agreement" consisted of a promise or an understanding that Sweeney (or RESCO) would be obligated to pay one-half of appellees' commission, which was to be calculated based upon whatever consideration for the merger appellees were able to obtain for Sweeney -- i.e., whatever appellees "got for him" in connection with a merger of RESCO and CCSL&G.  Affidavits submitted by DiCorpo and Michael L. Climaco substantiated appellees' claims as to the existence and terms of the oral "Compensation Agreement."  However, the facts of this case are clear that Sweeney never received anything for the merger because the merger, in fact, never occurred.  Thus, in our judgment, appellees were not entitled to anything under the very terms of the oral "Compensation Agreement."

Nevertheless, appellees claim a right to a two-percent commission on a merger that never occurred based upon the assumption that the November 1, 1989 letter of intent constituted a binding "Merger Contract" which was breached by appellants.  Appellees urge that "[t]he Consulting Firm was not responsible for Sweeney's repudiation of the merger.  Nor was it responsible for the failure of the Sweeney Firm to carry through on its Merger Contract [i.e., the letter of intent].  It still is entitled to receive its compensation, even though today the law firms are not merged."  However, we find that the letter of intent does not constitute a binding merger agreement.  Nor does it amount to a specific agreement to agree to a merger in the future.  As we stated in Normandy Place Assoc. v. Beyer (1982), 2 Ohio St.3d 102, 105-106, 2 OBR 653, 656, 443 N.E.2d 161, 164, "[i]t is not the law that an agreement to make an agreement is per se unenforceable.  The enforceability of such an agreement depends rather on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced."  Here, the express terms of the letter of intent clearly indicate that that document was nothing more than an agreement to principles which were subject to further negotiation and a detailed and definitive merger agreement.  While the letter may have provided the basic framework for future negotiations, the letter itself did not address all the essential terms of the merger.  Thus, the letter of intent is not a legally enforceable contract.

Moreover, even if we were to assume that the letter of intent was a specific agreement to agree to a merger in the future, the terms of the definitive agreement submitted to Sweeney after the signing of the letter of intent were such that Sweeney might have received nothing had the merger occurred.  The definitive agreement provided for certain adjustments to the amounts Sweeney might have been entitled to receive had the law firms combined, and contained a variety of obligations and contingencies that might have further reduced (or nullified) the amount Sweeney was to receive for the merger.  In this regard, we are in complete agreement with Judge (now Justice) Francis E. Sweeney's dissent in the court

of appeals:

"At his deposition, Mr. DiCorpo repeatedly testified that his only explanation to Mr. Sweeney of the amount of his commission was 'two percent of whatever I got for him.' Since the merger was never completed, and since Mr. Sweeney could [might] have received nothing even if the merger had been completed, I believe * * * [DiCorpo's] discussions of the terms of his fee of two percent [were] so indefinite as to make any alleged oral agreement illusory and unenforceable."

Therefore, we find that summary judgment was properly granted on the claims for breach of the alleged oral "Compensation Agreement." Thus, on this issue, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

We note that the court of appeals did not determine whether the trial court erred in granting summary judgment on appellees' claims for unjust enrichment. Rather, the court of appeals' majority found that this issue was moot given its determination that summary judgment should not have been granted on the claims for breach of the oral "Compensation Agreement." However, we have found that appellants were entitled to summary judgment on the claims for breach of contract and, thus, it is appropriate for us to now consider whether the trial court erred in granting summary judgment on the claims for unjust enrichment. We find that the trial court did not err in this regard. The record indicates that (1) appellants were not unjustly enriched in connection with the services performed by appellees on the proposed merger, and (2) appellants contractually agreed to pay appellees at a reasonable hourly rate for the consulting services rendered.3

Accordingly, we reverse the judgment of the court of appeals on the issues raised in appellants' appeal, and reinstate the judgment of the trial court granting summary judgment in favor of appellants on the claims set forth in the original complaint.

II
Appellees' Cross-Appeal

Appellees cross-appeal, challenging the court of appeals' determination that the allegedly defamatory statements made by Sweeney in his affidavit to the county prosecutor were protected by an absolute privilege.

In Bigelow v. Brumley (1941), 138 Ohio St. 574, 579-580, 21 O.O. 471, 474, 37 N.E.2d 584, 588, this court said:

"Upon certain privileged occasions where there is a great enough public interest in encouraging uninhibited freedom of expression to require the sacrifice of the right of the individual to protect his reputation by civil suit, the law recognizes that false, defamatory matter may be published without civil liability. * * *

"Such privileged occasions have by long judicial history been divided into two classes -- occasions absolutely privileged and those upon which the privilege is only a qualified one. The distinction between these two classes is that the absolute privilege protects the publisher of a false, defamatory statement even though it is made with actual malice, in bad faith and with knowledge of its falsity; whereas the presence of such circumstances will defeat the assertion of a

qualified privilege.   * * *

"It has been said by many courts that the occasions of absolute privilege are few and that the tendency is to limit them rather strictly to the following types of occasions:  (1) The legislative proceedings of sovereign states; (2) judicial proceedings in established courts of justice; (3) official acts of the chief executive officers of state or nation; and (4) acts done in the exercise of military or naval authority.  * * *"

We find that one of the established occasions of absolute privilege is directly involved in this case -- the doctrine of absolute privilege in a "judicial proceeding."  We agree with the court of appeals' conclusion that the doctrine of absolute privilege for statements made in a judicial proceeding applies in circumstances where, as here, an affidavit or statement is submitted to a prosecutor for purposes of reporting the commission of a crime.  As a matter of public policy, extension of an absolute privilege under such circumstances will encourage the reporting of criminal activity by removing any threat of reprisal in the form of civil liability.  This, in turn, will aid in the proper investigation of criminal activity and the prosecution of those responsible for the crime.

Recently, in Hecht v. Levin (1993), 66 Ohio St.3d 458, 613 N.E.2d 585, paragraphs one and two of the syllabus, a majority of this court held that:

"1.  A complaint filed with the grievance committee of a local bar association is part of a judicial proceeding.

"2.  A statement made in the course of an attorney disciplinary proceeding enjoys an absolute privilege against a civil action based thereon as long as the statement bears some reasonable relation to the proceeding.  (Surace v. Wuliger [1986], 25 Ohio St.3d 229, 25 OBR 288, 495 N.E.2d 939, approved and followed.)"

Clearly, if the filing of a grievance with a local bar association is part of a "judicial proceeding," the same must also be true of an affidavit filed with a county prosecutor. The filing of a grievance with the local bar association sets the process in motion for the investigation of the grievance and the possible initiation of a formal complaint.  Similarly, the filing of an affidavit, information or other statement with a prosecuting attorney may potentially set the process in motion for the investigation of a crime and the possible prosecution of those suspected of criminal activity.  In our judgment, it would be anomalous to recognize an absolute privilege against civil liability for statements made in a complaint filed with a local bar association, while denying the protections of that privilege to one who files an affidavit with the prosecutor's office reporting that a crime has been committed.  Granting an absolute privilege under the circumstances of this case is merely a logical extension of this court's holding in Hecht, supra.

Sweeney's affidavit was sent to the county prosecutor to report the alleged criminal activity of Michael V. Kelley.  At that time, it appears no criminal investigation of Kelley was ongoing, and no formal criminal proceedings against Kelley had been initiated.  Sweeney's affidavit initiated the process of investigation and possible prosecution of Kelley.  The absolute

privilege or "immunity" for statements made in a judicial proceeding extends to every step in the proceeding, from beginning to end. See Prosser & Keeton, Law of Torts (5 Ed. 1984) 819, Section 114. In this regard, Dean Prosser has noted that, "[a]lthough there is some authority to the contrary, the better view seems to be that an informal complaint to a prosecuting attorney or a magistrate is to be regarded as an initial step in a judicial proceeding, and so entitled to an absolute, rather than a qualified immunity." (Footnotes omitted.) Id. at 819-820. We agree with this assessment of the issue.

Appellees contend that the references in Sweeney's affidavit concerning DiCorpo did not bear some reasonable relation to the reporting of Kelley's alleged criminal activity. Since the purpose of Sweeney's affidavit was to inform the proper authorities of Kelley's conduct, appellees suggest that the statements concerning DiCorpo were irrelevant and immaterial and, thus, were not protected by an absolute privilege. As we indicated in Hecht, supra, the absolute privilege against civil action for statements made in a judicial proceeding extends to those statements which "bear some reasonable relation to the proceeding." Id. at paragraph two of the syllabus. See, also, Surace, supra, syllabus. We find that the statements in Sweeney's affidavit concerning DiCorpo did bear a substantial relation to the reporting of Kelley's alleged criminal activities. The statements at issue showed the means by which Kelley sought to conceal the alleged embezzlement of funds. Thus, we reject appellees' arguments that such statements were irrelevant, immaterial and impertinent.

Finally, appellees suggest that Sweeney's affidavit impugned DiCorpo by linking DiCorpo with Kelley, thereby placing DiCorpo in a false light before the public. According to appellees, this case provides us with an opportunity to recognize a cause of action in Ohio for invasion of privacy under a "false light" theory of recovery. In Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 424, 453 N.E.2d 666, 669-670, we said, "[t]his court has recognized a cause of action for invasion of privacy in Housh v. Peth (1956), 165 Ohio St. 35 [59 O.O. 60, 133 N.E.2d 340]. However, this court has not recognized a cause of action for invasion of privacy under a 'false light' theory of recovery. Under the facts of the instant case, we find no rationale which compels us to adopt the 'false light' theory of recovery in Ohio at this time." Given our determination that the statements contained in Sweeney's affidavit cannot form the basis for civil liability, this case (like Yeager) is obviously not the appropriate case to consider adopting, or rejecting, the false light theory of recovery.

Accordingly, we affirm the judgment of the court of appeals that appellants were entitled to summary judgment on the claims set forth in the supplemental complaint. We hold that an affidavit, statement or other information provided to a prosecuting attorney, reporting the actual or possible commission of a crime, is part of a judicial proceeding. The informant is entitled to an absolute privilege against civil liability for statements made which bear some reasonable

relation to the activity reported.[4]

### III
### Conclusion

For the foregoing reasons, we affirm the judgment of the court of appeals in part, and we reverse it in part. We reinstate the trial court's judgment in favor of appellants on the claims set forth in the original complaint.

Judgment affirmed in part
and reversed in part.

Moyer, C.J., A.W. Sweeney, Wright, Resnick, Donofrio and Pfeifer, JJ., concur.

Gene Donofrio, J., of the Seventh Appellate District, sitting for F.E. Sweeney, J.

FOOTNOTES:

1   The signed addendum to the letter of intent specifically modified item 7 of the letter to read:

"If net fees collected fall below $5,500,000.00 during either of the first two years, or below $4,250,000.00 during either of the second two years, or below $3,750,000.00 during the fifth, or below $2,000,000.00 during the last three years, then the buyout in item 3) above will be reduced by 75% which the net fees are below the stated number in this new item 7)."

2   The trial court also noted that appellants had paid appellees at an agreed hourly rate for at least part of the consulting services performed in connection with the proposed merger.

3   Apparently, appellees have yet to be paid for the consulting services performed in October and November 1989, which services were billed to appellants at the applicable hourly rates. However, appellees have not sought payment of the hourly fees in this case.

4   Appellees have also raised an issue in their cross-appeal concerning the trial court's denial of a motion to compel production of certain documents appellees sought to obtain in connection with the claims for defamation. Appellees' arguments are not well taken since the defamation claims are not actionable under the doctrine of absolute privilege.