{¶ 41} On this appeal from the orders of Judge Daniel Gaul that granted summary judgment against the late Ms. Kutnick's claims of legal malpractice and breach of a physician's duty of confidentiality, I concur in finding that Richard Klein had no attorney-client relationship with her, nor did he owe her any fiduciary duty. However, I respectfully dissent from the grant of summary judgment to Dr. Philip Fischer, and I dissent from the determination that John Widder and Peggy Widder did not breach duties owed to Ms. Kutnick. To countenance this conduct violates timehonored traditions of the legal profession as well as the Code of Professional Responsibility, and such violations are relevant as evidence that the Widders breached a duty to their client.
 {¶ 42} When the probate court receives information that a person may be incompetent, R.C. 2101.24(A)(1)(g) authorizes it "[t]o make inquests respecting persons who are so mentally impaired as a result of a mental or physical illness or disability * * * that they are unable to manage their property and affairs effectively, subject to guardianship[.]" Guardianship proceedings can be commenced sua sponte or upon the filing of an application for appointment of a guardian.[1] Through its investigators the court conducts an informal interview with the alleged incompetent and obtains a report of the investigator's observations and recommendations regarding the necessity of a guardianship or "a less restrictive alternative."[2]
Furthermore, "[i]n connection with an application for the appointment of a guardian for an alleged incompetent, the court may appoint physicians and other qualified persons to examine, investigate, or represent the alleged incompetent, to assist the court in deciding whether a guardianship is necessary."[3]
 {¶ 43} The record shows that, following the July 22, 1994, involuntary commitment hearing, John Widder discussed with Dr. Fischer the merits of having Ms. Kutnick placed under a guardianship, even though he acknowledged that she was absolutely opposed to such an action. Widder, who is a former Probate Court Referee and appears to enjoy a close relationship with its personnel, claimed that three days after the hearing, on July 25th, he told Probate Court Chief Referee Donahue that Ms. Kutnick had been released from Laurelwood and, notwithstanding his protestations that he did not want to be Ms. Kutnick's guardian, he claimed that Donahue advised him that he "must" apply to be her guardian.
 {¶ 44} Although Widder could have acted both as the applicant and as the attorney for himself as the applicant, he retained Klein to act as his attorney, and together they prepared the guardianship application and filed it on July 26th, 1994. Atthat time, Widder still represented Ms. Kutnick. The following day, attorney Richard Johnson wrote a letter discharging the Widders as Ms. Kutnick's lawyers.
 {¶ 45} In mid-August, the Widders obtained from Dr. Fischer a "Physician's Certificate" to support the guardianship application. Not only were the Widders no longer Ms. Kutnick's attorneys at that time, the release given while they were her attorneys permitted Dr. Fischer only to speak with Widder 
Widder about her mental health, etc. Nevertheless, in that document Dr. Fischer certified that he had examined Ms. Kutnick on July 23, 1994 — which he had not[4] — and set forth various reasons why she needed a guardian and why she was mentally incapacitated. When Dr. Fischer indicated he would be unable to honor a subpoena to testify at the September 24, 1994, hearing on the application, the Widders prepared an affidavit and obtained the doctor's signature attesting to information supporting the physician's certificate.
 {¶ 46} Presiding Probate Judge Donnelly ordered an independent psychiatric evaluation, and the appointed expert recommended appointment of a guardian for Ms. Kutnick's estate, but not for her person. On March 29, 1995, Nelli Johnson was appointed as guardian of Ms. Kutnick's estate. On June 20, 1995, Judge Donnelly granted Ms. Kutnick's motion for relief from judgment, vacated the guardianship order in its entirety, and dismissed the application for guardianship.
 {¶ 47} Ms. Kutnick's counterclaim/complaint against the Widders alleged an attorney-client relationship giving rise to a duty, a breach of that duty, and monetary damages proximately caused by that breach.[5] The attorney-client relationship imposes both contract and tort obligations on an attorney, and the client has a property interest in seeing those duties fulfilled.[6] The unique relationship between an attorney and his client was aptly described by the Ohio Supreme Court as follows:
{¶ 48} "The discharge of professional duties, demands greatand unreserved confidence from the client, and the connection ofthe attorney with courts, and his access to papers, requireunsuspected integrity. Hence general honesty and fidelityto clients, is not only necessary to his success, but even tothe performance of his duties. Other good qualities may bewanting in his character, and some vices may be present, butthese are the essential virtues of his calling, no more tobe dispensed with than courage in a soldier, or modesty in awoman."[7] (Emphasis added.)
 {¶ 49} Article IV, Section 2(B)(1)(g) of the Ohio Constitution grants the Ohio Supreme Court the authority to prescribe the standards of the practice of law in our state. Since 1970, the Ohio Code of Professional Responsibility ("OCPR") has been the primary source of the standards of conduct for Ohio attorneys. A lawyer is liable for the failure to exercise due care and diligence in fulfilling the duties owed to a client,[8] and the OCPR mandates duties owed a client.
{¶ 50} "The code has the force of law; this is especially truewith respect to the Disciplinary Rules, which are described inthe code's preamble as `mandatory,' rather than `aspirational,'in nature.
 {¶ 51} "* * *
 {¶ 52} "Laws intended to protect individuals may create normsof behavior, the violation of which may be deemed to beactionable upon the theory that the violator has not acted withdue care."[9]
 {¶ 53} Although I agree that a violation of the OCPR does not, in itself, create a claim for civil liability, it is a basis for claiming a breach of the standard of due care.[10] InFred Siegel Co., L.P.A. v. Arter Hadden,[11] the Ohio Supreme Court agreed that the violation of a disciplinary rule does not create an independent cause of action, but that case does not contradict Krischbaum. In rejecting a private cause of action for a disciplinary rule, the Fred Siegel court relied onAm. Express Travel Related Serv. Co. v. Mandilakis,[12] a case in which a third party sought to recover for the violation of a disciplinary rule because there had been no attorney-client relationship and could not claim legal malpractice. I agree that the OCPR does not create private actions outside the context of legal malpractice, but the lead opinion's view, that the Widders can defeat Ms. Kutnick's legal malpractice complaint by arguing that the only remedy available is the public disciplinary process, has the effect of making a violation of the OCPR a defense to a legal malpractice claim. This cannot be the intent of the lead opinion.
 {¶ 54} DR 7-101(A)(3) states:
v. "A lawyer shall not intentionally: Prejudice or damage hisclient during the course of the professional relationship, exceptas required under DR 7-102(B)."[13]
 {¶ 55} DR 4-101 provides in part:
v. "(A) `Confidence' refers to information protected by theattorney-client privilege under applicable law, and `secret'refers to other information gained in the professionalrelationship that the client has requested be held inviolate orthe disclosure of which would be embarrassing or would be likelyto be detrimental to the client.
 vi. "(B) Except when permitted under DR 4-101(C), a lawyershall not knowingly:
 vii. "(1) Reveal a confidence or secret of his client.
viii. "(2) Use a confidence or secret of his client to thedisadvantage of the client.
 ix. "* * *
x. "(D) A lawyer shall exercise reasonable care to prevent hisemployees, associates, and others whose services are utilized byhim from disclosing or using confidences or secrets of a client,except that a lawyer may reveal the information allowed by DR4-101(C) through an employee."
 {¶ 56} Furthermore, EC 5-1, entitled "Loyalty to Client," states:
v. "The professional judgment of a lawyer should be exercised,within the bounds of the law, solely for the benefit of hisclient and free of compromising influences and loyalties. Neitherhis personal interests, the interests of other clients, nor thedesires of third persons should be permitted to dilute hisloyalty to his client."
 {¶ 57} There was a duty owed to Ms. Kutnick, the Widders breached it, and the only question in dispute was the damages she sustained as a result of his breach. The legal malpractice action stems from the Widders' breaches of private duties of loyalty expressed in DR 7-101(A)(3) and DR 4-101 and owed to their client, Ms. Kutnick, not the public duties enforceable through disciplinary action.
 {¶ 58} The fact that a third party eventually was appointed as the guardian of the estate does not excuse the Widders' breach of duty, because Ms. Kutnick was forced to defend herself in proceedings that they instituted in violation of their duty of loyalty, that they prosecuted themselves, and that they supported using evidence obtained in violation of the duties of loyalty and confidentiality. In addition, the majority has overlooked the fact that Nelli Johnson was appointed only as guardian of Ms. Kutnick's estate, and that the guardianship action was eventually vacated. Because there was ample evidence of breach of duty, summary judgment was not appropriate on this issue unless there had been a determination that Ms. Kutnick had not sustained any monetary damages in defending against John Widder's application.
 {¶ 59} The lead opinion completely sidesteps this patent breach of duty. It first concludes that the Widders did not violate the duty expressed in DR 7-101(A)(3) because they took no action prejudicial to Ms. Kutnick until after the relationship was over. As noted, however, John Widder admittedly represented her at the time he filed the application. Thus, prejudicial conduct did take place during the course of the relationship, and the lead opinion's statement to the contrary is incorrect. It is clear that Widder violated DR 7-101 when he filed an application to be appointed guardian to this then client.
 {¶ 60} The lead opinion not only ignores what John Widder did as Ms. Kutnick's lawyer, it also claims that it is entirely appropriate to prejudice and damage a client by revealing, when you are no longer her lawyer, personal and confidential information acquired during the attorney-client relationship. However, under DR 4-101(B)(3), the duties of loyalty and confidentiality continue even after the termination of the relationship.[14] Indeed, even the death of the client does not extinguish the duty.[15]
 {¶ 61} The lead opinion trivializes the Widders' conduct by stating that their postrelationship breach of confidentiality is cognizable only as an action for invasion of privacy, rather than for legal malpractice or breach of fiduciary duty. Because the duty of confidentiality survives after the attorney-client relationship has ended, the Widders owed continuing, albeit limited, professional duties to Ms. Kutnick as both lawyers and as fiduciaries.[16] The elements of legal malpractice do not require that prejudicial conduct take place during the attorney-client relationship; it is necessary only that the lawyer violate a duty that arises from that relationship.[17] Included among the Widders' continuing responsibilities were the duties to refrain from breaching Ms. Kutnick's confidences, to refrain from inducing others to breach her confidences, and to refrain from using those confidences against her, all of which they breached.
 {¶ 62} The lead opinion continues to misconstrue the true nature of the Widders' perfidy by asserting that they had an absolute privilege to disclose her confidences because judicial proceedings were involved. This absolute privilege applies to "statements" only[18] — even if it applied to the Widders' presentation of evidence as witnesses in the guardianship proceeding, the privilege cannot apply to the Widders' deliberate use of disclosures by Dr. Fischer after they no longer represented Ms. Kutnick, nor can it apply to their breaches of confidence and loyalty in instituting the proceedings, conducting discovery, and preparing the case. It is the Widders' conduct, not their statements, that is at issue here, and the witness privilege does not extend to the tortious use of a client's secrets in filing a complaint, nor does the privilege apply when those secrets are used to obtain evidence. John Widder used Ms. Kutnick's confidences to her disadvantage to initiate the proceedings and to make his case; his intimate knowledge aided him in, among other things, making discovery requests and preparing for witnesses' testimony, including that of Ms. Kutnick herself. The privilege for statements made in judicial proceedings cannot extend so far.
 {¶ 63} The probate investigator's report indicates that she contacted John Widder, and that he discussed with her knowledge he gained as Ms. Kutnick's lawyer. Further evidence indicates the Widders requested specific medical records concerning Ms. Kutnick's history of psychiatric care, and that their knowledge of her medical history was obtained through the attorney-client relationship. It is hard to imagine a more blatant breach of loyalty than to sit at a trial table opposite one's former client while presenting evidence of, and cross-examining her about, private matters disclosed or derived during the course of the attorney-client relationship.
 {¶ 64} Despite the fact that neither her pleadings nor her appellate brief ever refer to anything other than the Widders' breach of duty, the lead opinion asserts that summary judgment was appropriate because Ms. Kutnick's claims were for invasion of privacy. Through this incorrect analysis, buttressed by inapplicable case law,[19] the lead opinion grants summary judgment on a claim that was never raised and ignores the fact that the Widders violated continuing duties of loyalty and confidentiality. Calling such violations invasion of privacy fails to recognize the importance of the attorney-client relationship and does an injustice to Ms. Kutnick by absolving her lawyers of the duties created by that relationship. Moreover, by miscasting the case as one for invasion of privacy, the lead opinion also states an alternative holding that Kutnick's action abated on her death. When appropriately analyzed as a legal malpractice claim, however, Ms. Kutnick's action survives.[20] Therefore, I cannot agree with the lead opinion that a breach of duty evidenced by violation of DR 4-101 does not provide a client with a cause of action if that disclosure results in damages.
 {¶ 65} The lead and concurring opinions also ignore Ms. Kutnick's cause of action under Biddle v. Warren Gen.Hosp.,[21] which held that a patient has a cause of action for the unauthorized disclosure of privileged medical information, and that a third party can be liable for inducing such a disclosure.[22] A claim of privilege for judicial proceedings should not be allowed here, because cases interpreting Biddle contemplate that a physician is not allowed to disclose unauthorized medical information when requested by a party in litigation until ordered to do so by a court.[23]
Nevertheless, even if Dr. Fischer could assert a privilege for voluntarily disclosing medical information upon a litigant's request,[24] such a defense would not be available to the Widders, who knew at the time of their requests that they had no legal authority to obtain Ms. Kutnick's confidential medical information.
 {¶ 66} The Widders knew they had no court authority for this action, and knew that they were, in fact, inducing Dr. Fischer to disclose information to them, rather than to the court. This is exactly the type of situation covered by Biddle's recognition of third-party inducement. When a lawyer uses a cloak of legality to extract an unauthorized disclosure from a physician, the patient has an action for unauthorized inducement. Biddle
states, at paragraph three of the syllabus:
"A third party can be held liable for inducing theunauthorized, unprivileged disclosure of nonpublic medicalinformation that a physician or hospital has learned within aphysician-patient relationship. To establish liability theplaintiff must prove that (1) the defendant knew or reasonablyshould have known of the existence of the physician-patientrelationship, (2) the defendant intended to induce the physicianto disclose information about the patient or the defendantreasonably should have anticipated that his actions would inducethe physician to disclose such information, and (3) the defendantdid not reasonably believe that the physician could disclose thatinformation to the defendant without violating the duty ofconfidentiality that the physician owed the patient."
 {¶ 67} These elements are inescapably applicable here. The Widders knew, at the time they sought the physician's certificate from Dr. Fischer, and at the time they sought his affidavit for the hearing, that they no longer represented Ms. Kutnick and, therefore, that they had no legal authority to obtain her confidential medical information. Although there is some dispute concerning whether the Widders notified Dr. Fischer that they no longer represented Ms. Kutnick, there is no dispute that they requested both the physician's certificate and the affidavit, that they prepared the affidavit for Dr. Fischer, and that they encouraged him to rely on their expertise in probate and guardianship matters.
 {¶ 68} Ms. Kutnick presented substantial evidence that the Widders induced Dr. Fischer to breach the physician-patient privilege, not only in violation of their duties of loyalty and confidentiality, but also in violation of Biddle. This evidence is sufficient to defeat summary judgment against the Widders, because she had viable claims for legal malpractice, breach of fiduciary duty, and inducement of the breach of a physician-patient privilege.
 {¶ 69} During his deposition taken for this case, John Widder admitted that, during a hearing on the guardianship application before Judge Donnelly, the judge advised him he had been wrong to file the guardianship application. Widder opined, however, that the judge was 110% wrong. Despite this defiant attitude toward any criticism of his conduct, the Revised Code provides ample procedures allowing guardianship proceedings to go forward without requiring a lawyer to commit the breaches of duty evident here. Whatever their reasons, the Widders violated duties owed to Ms. Kutnick, and they should be liable for any damages she suffered as a result.
 {¶ 70} The judge found that Ms. Kutnick had waived the physician-patient privilege because, among other things, she failed to revoke the release she gave the Widders and she failed to notify Dr. Fischer that the Widders no longer represented her. However, despite Ms. Kutnick's failure to notify Dr. Fischer that the Widders were no longer her lawyers, there is a factual dispute concerning whether the Widders themselves notified Dr. Fischer prior to obtaining the physician's certificate in August of 1994.
 {¶ 71} Dr. Fischer stated that the Widders did not notify him that they no longer represented Ms. Kutnick, and John Widder testified that he did not inform Dr. Fischer of this fact, but Peggy Widder stated that she did notify him. Dr. Fischer also knew that Ms. Kutnick had employed and terminated a number of other lawyers prior to hiring the Widders. Therefore, summary judgment on the issue of waiver was inappropriate. Although I believe that Dr. Fischer can argue, in a defense or cross-claim, that his unauthorized disclosure was induced by the Widders' conduct, the dispute concerning his knowledge of the circumstances raises factual issues for disposition on remand
 {¶ 72} The separate concurring opinion apparently does not agree with the characterization of Ms. Kutnick's action as one for invasion of privacy, but it mistakenly finds that the Widders' conduct was within the bounds set by the OCPR, as modified by the Model Rules of Professional Conduct ("MRPC"). I first note that the MRPC has not been adopted in this state, and the OCPR continues to be applicable. Moreover, even if MRPC Rule 1.14 did apply, the concurring judge has not provided a satisfactory rationale for her interpretation of that rule.
 {¶ 73} The MRPC, like the OCPR, does not prevent a lawyer from notifying proper authorities that a guardianship investigation might be necessary, but neither set of rules can be viewed as condoning the events here. The Widders did not simply notify authorities and allow an independent investigation to take place — they instituted and prosecuted the guardianship proceedings themselves, and John Widder sought appointment as Ms. Kutnick's guardian. This is improper under any formulation of the rules, because MRPC 1.14(b) does not envision a lawyer seeking to have himself appointed as guardian "except in the most exigent of circumstances, that is, where immediate and irreparable harm will result from the slightest delay."[25]
 {¶ 74} Whatever Ms. Kutnick's condition may have been, the record here shows no imminent catastrophe that would justify the Widders' extraordinary intervention, even under the MRPC. It is one thing to raise competency issues "in general terms[,]"[26] but the lawyer is not authorized to actively prosecute such an action against one's client or former client; investigation can take place, proceedings can go forward, and evidence can be adduced from sources other than the prospective ward's lawyer. Absent a life-threatening emergency, the procedures set forth in R.C. Chapter 2111 make it unnecessary for a lawyer to make the decision contemplated in MRPC Rule 1.14(b), because the proceedings can be otherwise initiated, and the investigation can be otherwise carried out.
 {¶ 75} Whether under the OCPR or the MRPC, a lawyer is to act as advocate and adversary for his client, and not as a guardian ad litem, who can be separately appointed to seek the client's best interests, including the appointment of a formal guardian.[27] The Cleveland Bar Association has drawn the same distinction, and has opined that a lawyer should seek the appointment of a guardian ad litem rather than instituting an adversarial guardianship petition against his own client. In its conclusions, the opinion specifically states:
{¶ 76} "The attorney should not petition the probate court forthe appointment of a guardian under [R.C. 2111.01,] for to do sowould place him in an adversarial position in relation to hisclient and creates a conflict of interest. However, seeking theappointment of a guardian ad litem is generally an appropriatecourse of action."[28]
 {¶ 77} I also disagree with the concurring opinion's finding that none of Ms. Kutnick's confidences were breached, because the Widders sought, obtained, and filed Dr. Fischer's affidavit after they were no longer authorized to do so. Regardless of whether one disputes the character of other information, the information disclosed in Dr. Fischer's affidavit was confidential, and the Widders disclosed, or were substantially responsible for the disclosure of, that information. Nevertheless, the Widders breached duties of loyalty even if one finds no technical disclosure of confidential information.
 {¶ 78} There is no justification in the OCPR, the MRPC, or otherwise, for a lawyer to institute and prosecute a guardianship proceeding against his client, much less to seek to become the client's guardian. Filing such an action against one's client, and seeking to be named guardian, is inexcusable. Prosecuting such an action oneself, using information gained during the relationship, furthers the disloyalty, regardless of whether the information used is viewed as confidential. Whatever the character of the information, the Widders' knowledge was gained through their attorney-client relationship, and they used that knowledge to file and prosecute an action against their client.
 {¶ 79} I note also that, by finding only that the information used against Ms. Kutnick was not confidential, the concurring opinion has ignored or diluted the importance of the word "secret" in DR-4-101(A), which defines the term as "information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Even if not confidential, facts such as the condition of Ms. Kutnick's home and her police records should not be considered public knowledge. Certainly the interior of Ms. Kutnick's home should have been considered a private matter, and her police record, while publicly available, is not a matter to arouse great public interest. One would be hard-pressed to argue that the Widders did not use information "gained in the professional relationship" against Ms. Kutnick, and it is by no means clear that such records would have been sought or obtained had the Widders not learned of their existence during the professional relationship.
 {¶ 80} Ms. Kutnick has presented substantial evidence to show that the Widders breached their duty of loyalty and confidentiality by filing and pursuing the guardianship proceeding against her, and by using confidential or "secret" information against her in that proceeding, whether through direct statements or by gaining advantages in discovery, preparation, and strategy. The Widders used information gained during the attorney-client relationship to initiate the proceedings and to make the case for guardianship and, as already noted, their intimate knowledge aided them in all aspects of prosecuting that case.
 {¶ 81} The term "secret" in DR 4-101(A) is intended to further ensure a client's ability to maintain a candid relationship with the lawyer. The information disclosed in such a relationship stems from the trust engendered not only by the duty of confidentiality, but by the duty of loyalty. In order to obtain the best possible representation, the client must make himself vulnerable to the lawyer, and this vulnerability can occur through the disclosure of information that might not be confidential, but would not necessarily be disclosed or discovered otherwise. In order to retain the "great and unreserved confidence"[29] so vital to the attorney-client relation, a lawyer must protect a client's unprivileged secrets as well as privileged matter.
 {¶ 82} Although the Widders filed and prosecuted the action against Ms. Kutnick, and used information learned in the course of the attorney-client relationship against her, the concurring opinion concludes that they did nothing more than "seek the appointment of a guardian" under MRPC Rule 1.14(b). The concurrence also argues that the same result would have occurred had the Widders notified the probate court that a guardianship might be necessary, rather than filing and prosecuting the action themselves. I have already noted that MRPC Rule 1.14 has not been interpreted to allow a lawyer to prosecute a guardianship against his client,[30] and one should not assume that a probate court investigation would have resulted in a guardianship proceeding against Ms. Kutnick,[31] or that such a proceeding, if it occurred, would have taken on the same character as the one prosecuted by the Widders. For example, such a proceeding might have sought only guardianship of the estate, and not of the person. And, as discussed, it is reasonable to suspect that defending an action against one's former lawyer would seem a more daunting, costly proposition than defending against a stranger.
 {¶ 83} I would reverse and remand for further proceedings.
APPENDIX A.
 {¶ 84} Alexander v. Culp (1997), 124 Ohio App.3d 13,705 N.E.2d 378: a complaint for statutory negligence and invasion ofprivacy against a minister who, after counseling the husband, told the wife that husband was having an extra-marital affair. The court, per Judge Dyke, held that R.C. 2317.02, which protects persons against confidential disclosures in legal proceedings, does not create a statutory negligence cause of action should confidential information be disclosed outside of legal proceedings. However, the husband had a common law negligence action and would have had a clergy malpractice action if the confidences had involved or compromised any religious tenets.
 {¶ 85} Greenwood v. Taft, Stettinius Hollister (1995),105 Ohio App.3d 295, 663 N.E.2d 1030: a complaint for wrongfuldischarge and invasion of privacy by an attorney who alleged he was fired from his firm because he was gay and that information about his male partner was disseminated.
 {¶ 86} Rothstein v. The Montefiore Home (1996),116 Ohio App.3d 775, 689 N.E.2d 108: another invasion of privacy claim
that arose when the nursing home released a potential patient's financial information to his children. Because the person died before the information was disclosed, there was no invasion of his privacy for which he could claim compensation for mental suffering, shame or humiliation. Because the person was never a patient, there was no violation of R.C. 3721.17 (Patients' Bill of Rights).
 {¶ 87} Pisani v. Pisani (Dec. 11, 1997), Cuyahoga App. No. 72136: defamation claims against persons who said things about Ms. Pisani during her divorce proceedings.
 {¶ 88} Hecht v. Levin, 66 Ohio St.3d 458, 1993-Ohio-110,613 N.E.2d 585: a defamation claim arising out of the filing of a grievance with the certified grievance committee of the bar association. The Supreme Court held that filing the grievance — which is confidential — is privileged as a statement within a judicial proceeding.
 {¶ 89} M.J. DiCorpo, Inc. v. Sweeney, 69 Ohio St.3d 497,1994-Ohio-316, 634 N.E.2d 203: defamation and libel claims
arising out of affidavit that was filed with the County Prosecutor but somehow got to a newspaper. DiCorpo claimed that false information placed it in a false light before the public. The Supreme Court held that if filing a grievance with a local bar association is part of a judicial proceeding, the same must be true of an affidavit filed with the prosecutor because each sets in motion an investigation that may lead to a formal complaint or possible prosecution. Therefore, the affidavit qualified as a witness statement.
 {¶ 90} None of these cases has any relationship to claims of attorney malpractice/breach of duty.
[1] R.C. 2111.02(A).
[2] R.C. 2111.041.
[3] R.C. 2111.031.
[4] The record does not clearly show the date of Dr. Fischer's last examination of Ms. Kutnick, but it was prior to May of 1994. However, he did admit in his deposition that he had only a "brief interaction" with her on July 23, 1994, "in making arrangements for care to another facility."
[5] Krahn v. Kinney (1989), 43 Ohio St.3d 103,538 N.E.2d 1058, syllabus.
[6] Loveman v. Hamilton (1981), 66 Ohio St.2d 183, 184-185, 20 O.O.3d 194, 420 N.E.2d 1007.
[7] State ex rel. Kilbourn v. Hand (1839), 9 Ohio 42.
[8] Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 68,567 N.E.2d 1291.
[9] Id.
[10] Id.; see, also, Montali v. Day, Cuyahoga App. No. 80327, 2002-Ohio-2715, at ¶ 36-38 (conduct comprising breach of disciplinary rule could be used to support a legal malpractice claim).
[11] 85 Ohio St.3d 171, 1999-Ohio-260, 707 N.E.2d 853.
[12] (1996), 111 Ohio App.3d 160, 675 N.E.2d 1279.
[13] DR 7-102(B) concerns the duty to reveal a client's fraudulent acts.
[14] Kala v. Aluminum Smelting Refining Co., Inc.,81 Ohio St.3d 1, 4-5, 1998-Ohio-439, 688 N.E.2d 258.
[15] Taylor v. Sheldon (1961), 172 Ohio St. 118, 15 O.O.2d 206, 173 N.E.2d 892, paragraph two of the syllabus.
[16] Kala, supra; see, also, Costin v. Wick (Jan. 24, 1996), Lorain App. No. 95CA006133 (malpractice and intentional breach of fiduciary duty are distinguishable); David Welch Co.v. Erskine Tulley (1988), 203 Cal App.3d 884, 890-892 and n. 4, 250 Cal.Rptr. 339 (aspects of fiduciary duty and duty of loyalty continue after attorney-client relationship ends).
[17] Krahn, supra.
[18] M.J. DiCorpo, Inc. v. Sweeney, 69 Ohio St.3d 497,505-506, 1994-Ohio-316, 634 N.E.2d 203.
[19] See appendix A for synopsis of the majority opinion's cases.
[20] Loveman, at syllabus.
[21] 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518.
[22] Id. at paragraphs one and three of the syllabus.
[23] See, e.g., Sirca v. Medina Cty. Dept. of Human Servs.
(2001), 145 Ohio App.3d 182, 186, 762 N.E.2d 407 (seeking court order of disclosure); Jones v. Records Deposition Serv. of Ohio,Inc., Lucas App. No. L-01-1333, 2002-Ohio-2269, at ¶ 11 (stating that disclosure can be compelled).
[24] In order to assert such a privilege, I believe Dr. Fischer would have to show that he reasonably believed the disclosure was mandated by the court, and that question is in dispute.
[25] In re Discipline of Laprath, 2003 SD 114, 670 N.W.2d 41, 2003-SD-114, at ¶ 51, quoting ABA Com. on Ethics and Professional Responsibility, Client Under a Disability, Formal Op. 96-404.
[26] Commonwealth v. Simpson (1999), 428 Mass. 646, 648 n. 1,704 N.E.2d 1131.
[27] In re M.R. (1994), 135 N.J. 155, 175-176, 638 A.2d 1274;In re Estate of Milstein (Colo.App. 1998), 955 P.2d 78, 83.
[28] 1989 Cleveland Bar Assn. Professional Ethics Commt. Op. No. 89-3.
[29] State ex rel. Kilbourn v. Hand, supra.
[30] Laprath, supra.
[31] As noted, the guardianship was eventually dismissed.